# UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Court File No. CR-21-93 (JRT/TNL)

UNITED STATES OF AMERICA,

Plaintiff,

**REPLY TO RESPONSE TO MOTION TO SUPPRESS**

v.

ROBBIN ALLEN THOMAS,

Defendant.

## DEFENDANTS REPLY TO PROSECUTIONS RESPONSE

Defendant Robbin Allen Thomas. Respectfully, submits this reply to the prosecutions response to the defendants motions to suppress the fruits from the illegal stop on 2-19-21 of the defendant to the courts.

**Reasonable articulate suspicion to justify a stop**

Under the Fourth Amendment, a police officer may conduct a limited stop to investigate suspected criminal activity if the officer can point to specific and articulate facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion. While the stop must not be the product of mere whim, caprice, or idle curiosity, the factual basis required to support an investigatory stop is minimal, as Minnesota has adopted the Terry standard that a police officer only needs to have observed unusual conduct which leads the officer to believe that criminal activity may be

taking place to support and investigatory stop. If an officer observes a violation of a traffic law, however insignificant, the officer has an objective basis for stopping the vehicle. See Minn. Stat. § 169.69.

It is well beyond the facts that the deputy could not see who was driving the truck before making the stop. From the angle in which deputy Arcand was seated being at least 18 inches lower then the truck, looking through mirror tape, not glass (not glass but tape), neither could he see through the rear-view mirror to identify the driver of the vehicle. Is the prosecution not making out what has been made clear. OK here it is in a nut shell, the side mirror that the government is relying on to support their argument is reflector tape that was put in the side view mirrors housing to give the image that the mirror was the factory glass mirrors that come with the vehicle when you buy a new vehicle. In the government's (post hearing opposition motion Doc. 122) the prosecution would continue to state that after catching up, Deputy Arcand looked through the rear tinted windscreen of the blue truck and used it's side- mirror tape and rear view mirror through the tinted rear windscreen with a decal on the back of it right where the head of the driver would be, or should I say the hair of the driver would be to identify the driver but never seeing the person in the RED truck. How observant is this officer really he can see all these thing coming so fast all at one time; this guy could see and identify the driver in a moving vehicle from behind with the sun shining off the back of a tinted back window, with the decal in the way, into the rear-view mirror to see the face of driver, and also use the side-view mirror tape to identify positively the person driving the truck but could not see the person sitting in the RED truck after looking at the truck for 3 minutes with out moving and being focused on the RED truck. Are we to believe this as true, and his great instincts are to be repelled by the the color red. Moving forward "So at some point the glass was broken out of the housing of the side-view mirror and was

replaced with (tape) which would give the appearance of glass (without the reflective qualities of glass) but so one would not get a ticket for there not being mirror's in place for obvious safety reasons, there if that is clearly explained". (From **SUPPORT AFFIDAVIT FOR MOTION'S TO SUPPRESS**) (this is document that the prosecution was purporting should not be allowed into the record as if they were the self proclaimed judge, which this document should be admitted as it originates from the government's exhibit .1, and is just a high-light of what they placed onto the record.  You can plainly see the difference in mirror tape and side-view mirror glass in example #5 of Deputy Arcand's police cruiser and the different pictures of the truck that Thomas was in. This is from the video of the government's exhibit #1 zoomed in to show the best possible transparency. The prosecution would also go on to comment about the time line off the body worn camera of Arcand (1:00 -1:54 supp Gov Ex.1) and it showing light around trees and the sky with a shiny surroundings which also aids the obvious that the light would  reflect well but an image would not. If the officer is claiming to have seen Thomas through the side mirror tape to see Thomas' face , and profile Thomas, which officer Arcand is, like the government has said repeatedly alleged to be possible. We would clearly have to conclude that the deputy/officer/ government's claims lacks merit.

The government would also conclude to make more merit-less claims that the deputy allegedly could see through the back tinted window with decals in places that would make it far more difficult  to see the hair of the driver through the rear-view mirror to positively identify a driver. This, is even outrageous to say as we can see plainly that the video recorder is in a better position to capture the events, sitting at an 18 inch higher advantage and closer technically being that it is located in the top right-hand corner of the front drivers window of the squad car. So it being placed in a better position and having an mechanical eye still the video is clear that he could not see who is driving the truck to identify the driver. Yet the government continues to put

forth false and misleading information. Is there no consequence? Will the court not make a

difference.

For an example:

     "another several hundred up 149th Avenue that led to a house. (*Id.* at 38:13-15, 86:20 –

87:9). Deputy Arcand's dash-mounted camera captured the blue truck pulling out onto 149th Avenue.

(Gov't Ex. 1 at 00:00-15). Still frames from the footage show the truck leaving the driveway and

driving on the public roadway.



(*Id.* at 00:09, 00:13).

Deputy Arcand accelerated to catch the blue truck as it drove down 149th Avenue, identify the driver,

and run the vehicle's registration. (Supp. Hrg' Tr. at 38:15-24; Gov't Ex. 1 at 00:05-25). After catching

up, Deputy Arcand looked through the rear windscreen of the blue truck and used its side- and rear-

view mirrors to identify the driver. (Supp. Hr'g Tr. at 38:25 – 39:19; Gov't Ex. 1 at 00:22-30".

    1. the camera is located in the top right hand corner of the front wind shield. Not dash camera.

       2. he started in hot pursuit, (a show of force) for the truck to seize it for what, (why identify

          the driver and run the vehicle registration), but to apprehend the vehicle.

       3. He could see the person but not the plate of the truck??? he run the plate before the stop???

          literally, what is this? An attempt to show that there is no extent to the amount of foolishness

that the prosecution is willing to display. What can anyone discern from the two black and white photos

they have presented they are very unprofessional in there presentation given that they have the full

extent of the government's resources to pull from we would expect better photos to prove that the

evidence of identifying the driver is not just merit-less. The video and the photos continue to weigh in

favor of the defendant. This being that you can not see the driver of the truck until the driver looks out

of the door of the truck when while out of the screenshot of the camera which is why the officer called

the name of the driver. And that took place after the deputy had seized the vehicle. This photo is at 0:35

seconds and the officer says the drivers name after this at 0:40 seconds Gov Ex.1.



Do we <u>need</u> to point out that the dog was in the back seat

blocking the view of the drivers head. so even more so you now know that there is no way to see the

driver of this truck not from the back, or through the back windscreen as the prosecution alleges. There

claim that the officer knew who was driving before the seizing of the vehicle is merit-less. Arcand seen

Thomas at the point between 0:30 and 0:35 seconds. Not before, he was thinking of the defendant when

he came to the property which is why Thomas' name was in Arcand' head and was hoping to see

Thomas (the defense' opinion is that the officer did not want blacks around). And if the other officer

had told him there was a reason to be there why was no report made, or bulletin notification for that

matter or some record of this made to reference. The officer had no reason to chase down the blue

truck, and the truck had not traveled any number of blocks for the officer to claim that he was

following the truck for any length of time. Be it less then 30 seconds is the total reality of the officer

being behind the truck on the roadway. Also less then 15 seconds of the 30 seconds was he even

remotely close enough to see the plate of the truck let alone the driver. <u>He did not run the plates like he</u>

<u>said until after the stop</u> (creditably). Also there was no Reasonable articulable suspicion to justify

chasing down the truck to suspect that a crime had been committed or a crime was under foot. What

Reasonable articulable suspicion did he have to commit to hot pursuit? What crime had been

committed? The law states " the stop must not be the product of mere <u>whim, caprice, or idle curiosity"</u>. It also says "if the officer can point to specific and articulable <u>facts</u> which, taken together with <u>rational inferences</u> from <u>those facts,</u> reasonably warrant the intrusion". The law also states "If an officer <u>observes</u> a violation of a traffic law, however insignificant, the officer has an objective basis for stopping the vehicle. See Minn. Stat. □ 169.69". We know that the officer did not see who was in the truck, so what was the violation that he witnessed?

 He did not run the plates on the truck, which the truck was registered to someone else other then the driver. The driver did not swerve. There was nothing wrong with the break lights or plate lights or anything else. The officer did not have the time to go through any of the procedural standards and nor did he care too. He was there to prove a point and that was it. Now we have the prosecution drawing for straws the make up a reasonable articulable suspicion to justify the stop.

Where as: The government has said the the deputy had reasonable articulable suspicion to justify a stop. This is another non-truth for this to happen the officer would need to know who was driving the truck, and to say; that person did not have a valid drivers license the officer would need to have had run the persons name through DVS (NCIC) to verify that the driver did not have a valid drivers license before making the stop not after as in this case. In State v. Rosebush.

*"such evidence existed because the trooper observed defendant driving his vehicle on a highway, and, before stopping defendant's vehicle, he verified that defendant's driving privileges were revoked. Therefore, the evidence of defendant's admission and the corroborative evidence provided by the trooper were sufficient to support defendant's conviction for driving after revocation". State v. Rosebush, 2008 Minn. App. Unpub. LEXIS 1024 (Minn. Ct. App. Aug. 26, 2008).*

As you can see, and must know you; <u>must</u> <u>verify</u> that the defendant's driving privileges are revoked before making the stop or seizing the vehicle with the lights not assume. " While the stop must not be the product of mere whim, caprice, or idle curiosity". The deputy <u>must</u> have verified no later then 24 hours before the stop that the defendant's driving privileges are revoked which he did not. He

also had no clear view of who was driving the vehicle. And he has <u>never</u> seen the defendant in this

vehicle, and he has <u>never</u> known the defendant to have a vehicle like this, and the defendant has <u>never</u>

been in the vehicle before, the officer said in written report on (2-19-21 Arcand report) that he knew

who was driving the vehicle when it pulled out on to the road, and then in testimony on ( 3-18-22) he

said that he did not know who it was driving the vehicle until the truck would pull into the driveway

leaving the roadway. The deputy would also say that he ran the license plate as he was driving down

the roadway, and then it can be heard him saying (" David Edward King 719" at 0:36 on government's

exhibit #1) which is clearly after he had stopped the truck. To say it nicely the credibility of the only

witness that the government has brought forth has been greatly compromised by these and the other

fact that the officer also stated in and about the events in his written reports and from;

*(The transcripts from 3-18-22 page 125 line 1).*
*In your report, page 6 of 8, it states, "While*
*handling the evidence" -- this is a statement that you wrote --*
*"While handling" -- excuse me. Is it -- is this a statement*
*that you had written: "When handling the evidence from this*
*point forward, I used latex gloves and masks, and Detective*
*Tschida assisted me with the evidence packaging and submission.*
*We used a clean paper bags -- a clean paper bag on top of the*
*scale when weighing the suspected methamphetamine's." Do you*
*remember making that statement, sir?*

The defense would then present the court with pictures that show that the officer's/agents, after

going out of there way to make sure that the statements were put into the report as real and accurate, to

accentuate the fact that they were super careful to do all things necessary to be law biding and correct.

Were in fact not true or correct. It seems that it was more of a hocks to make it look as if they were

being truthful, mocking the courts and  staging the reports. This was an act of deceit, lying not a little

but strait out. The officers credibility has no merit, he is left merit-less.

**THE PROLONGED STOP**

**Legal standard**

"When an officer makes a routine traffic stop, the officer is entitled to conduct an investigation reasonably related in scope to the circumstances that initially prompted the stop." *United States v. Sanchez*, 955 F.3d 669, 674 (8th Cir. 2020) (quotations omitted). If a stop is prolonged beyond the time reasonably necessary to conduct this investigation, it violates the Fourth Amendment. *Id.* "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's mission— to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (cleaned up).

## I.  The initial scope and duration of the investigation was <u>not</u> reasonable.

In total, approximately seven minutes elapsed between Deputy Arcand stopping Thomas and his

return to the his car to confirm if Thomas had a suspended license. (Gov't Exs. 1 and 2 at 00:30 –

07:30). During this time, Thomas never delayed  Arcand's investigation he was asking Deputy Arcand

why he was  harassment him, and he produced the truck-related paperwork Deputy Arcand requested

when he got out of the truck. (Gov't Ex. 2 at 00:45 – 05:45). Arcand asked if Thomas was going to get

the truck insured and responded to Thomas' questions of harassment. (*Id.*) He asked Thomas questions

related to his ownership of the vehicle, its registration, and his driving status which were already

answered several times. (*Id.*). He also removed knives from Thomas' belt for no reason he stated in

testimony(3-18-22) that he did not feel threatened by Thomas or his dog. (*Id.* at 03:30-45). Ultimately,

Deputy Arcand went to his squad car where he discovered that there was no more for him to do except

write a ticket (he would return to his car and then say "come on just give me anything" in video from

Gov Ex.1 at 6:17 – 6:19 and the back seat video same place this will be revisited in latter a filing) and

make sure to confirm that Thomas' license was suspended because he did not run it first like he should

have according to police procedural policies before stopping the vehicle. He was told that Thomas was

sending the truck to get licensed so he knew that tags was out of date already so what was the new

discovery that he needed to speak further with Thomas about. (Gov't Exs. 1 and 2 at 05:40 – 07:30).

Deputy Arcand's initial investigation was not appropriate not in scope and not in duration. His

questions related to Thomas' where about what he was doin, and where he was going, and who was in

the red truck, and where did Thomas have to be, and who Thomas got the vehicle from, and try to tell

Thomas that he would never be able to get it licensed and on and on, which were not the basis for the stop. The seven minutes this investigation took was unreasonable, and should have ended in a ticket especially considering much of that time was spent addressing nothing but looking at the title, being that he did not have to wait for Thomas to produce the requested paperwork/information he already had it.

Moreover, Deputy Arcand did not have reasonable suspicion of any thing, as four minutes had elapsed since he concluded his traffic investigation. This is not a short delays in a stop, after the initial basis for the stop is resolved he should have been on his way, the delay was unreasonable when officers had no "increasing suspicions that criminal activity is afoot". *See United States v. Williams*, 929 F.3d 539, 544–45 (8th Cir. 2019) upholding the constitutionality of a two-minute delay between when officers completed their investigation. In this case it was four minutes witch is two minutes beyond the constitutionality of a two-minute delay. Plainly it was out of the scope the Constitution and should be treated as such.

Further more we know about the weather in Minnesota in February, and the likeliness of this officer smelling marijuana out side in the cold with a runny noise/ or a cold so far away from the alleged source. With the wind at ones back blowing the alleged smell away from an individual, and with covid being a factor it is so unlikely. We all as Minnesotans don't need to point out the obvious. These continued merit-less claims are over the top and unreal.

## II. A seizure justified only by a police-observed traffic violation.

When did the seizure begin? This argument is not new it has been pointed to by the prosecution and the defense both. Now here are the facts (Gov Ex .1) starts with the deputy more then two blocks away from the defendant who was in the driveway of the pole barn at that time. The defendant would pull out of that driveway and proceed down the road way at a speed that was with in the allowable limit

never exceeding 25 mph to 30 mph. The deputy would instantly show force and begin to chase down in hot pursuit the vehicle to seize it by reaching speeds that would double and tipple the speed of the defendant showing the authority of the sheriff department by over taking and seizing the vehicle by force. Being the deputy was showing such force while in a plainly marked county car in hot pursuit and approaching at such a high speed (seized). The defendant would then pull to the far right-hand side of the road (Gov Ex .1 at 0:20) using the turn signals to notify that the driver was submitting to the will and force of the deputy (seized), and allow the deputy to pass as he was moving at such a speed it was assumed that the deputy was on to an emergency and the defendant needed to make room for the rapidly approaching vehicle, or to submit to the needs and force of the deputy for a traffic stop (seized). The deputy would continue his show of force by staying focused on the truck the defendant was in proceeding to make the stop which the deputy did (seized), so the defendant stayed to the far right-hand side of the road as he was being forced to pull off the road, (seized) because as he knew he was being pulled over (Gov Ex .1 at 0:22). At this point the defendant was under the assumption by this show of force that he was being stopped (seized) by the deputy which is the same as being seized he presented his authority in a forceful manner and the defendant submitted to his authority(Gov Ex .1 at 0:21). This is the point at which the deputy had seized the defendant and the vehicle. The deputy's show of force and authority replaced the normal use of his lights and his lights became just warning signals to the passing pedestrians being he was still on the road. So at this point being this is long before when the deputy stated that he had identified the driver and to have known that the driver did not have driving privileges. So this would be all the fact that we need as to whether or not reasonable articulable suspicion to justify the stop, and that would be there was no reasonable articulable suspicion to justify a stop. He said that he did not know who was driving at the time the truck enters the roadway( Gov Ex .1 at 0:03) and we know that he could not. Not from the black and white granulated pictures that prosecution had presented as examples or in the Gov Ex .1 video of the stop. We do know that the

deputy made a show of <u>force</u> by making one full block in ten seconds, and in fifteen seconds in hot

pursuit he mad two blocks even tapping his breaks in the intersection because he was moving to fast for

normal traveling speeds in a residential area if he would have hit someone with out his lights on there

would have been no excuse for his actions, but from his actions we get the conclusion that he had

committed to <u>hot pursuit</u> and to seizing the vehicle.

Still at the point of the seizure beginning ( Gov Ex .1 at 0:03) what was the reasonable articulable

suspicion to justify the stop. What law was broken at( Gov Ex .1 at 0:03) or up to ( Gov Ex .1 at 0:22)

to justify the seizure / chase <u>in hot pursuit</u>.

*Under the Fourth Amendment, a police officer may conduct a limited stop to investigate*

*<u>suspected criminal activity</u> if the officer can point to specific and <u>articulable facts</u> which, taken*

*together with rational inferences from <u>those facts</u>, reasonably warrant the intrusion. While the stop*

*must not be the product of mere <u>whim, caprice, or idle curiosity.</u>*

The following terms have the following definitions:

(a) *<u>SEIZE</u>: To put in possession.* (Black's Law Dictionary 4th ed. Rev.)
(b) *<u>SEIZURE:</u> To take possession of forcibly, to grasp, to snatch, or to put in possession. Hardie v. State,* 140 Tex.Cr.R. 368, 144 S.W.2d 571, 575. (Black's Law Dictionary 4th ed. Rev.)
(c) *<u>CAPRICE:</u> An abrupt change in feeling, opinion, or action due to a whim or fancy.* **(Webster's Dictionary, 2015)**
(d) *<u>CURIOSITY:</u> Disposition, often a meddling disposition, to inquire into anything. That which is curious, or fitted to excite or reward attention.***(Webster's Dictionary, 2015).**
(e) *<u>FACT:</u> A thing done; an action performed or an incident transpiring; an event or circumstance; an actual occurrence. An actual happening in time or space or an event mental or physical. Fowler-Curtis Co. v. Dean,* 203 App.Div. 317, 196 N.Y.S. 750, 754; *German-American Ins. Co. v. Huntley,* 62 Okl. 39, 161 P. 815, 817; *Rost v. Kessler,* 267 App.Div. 686, 49 N.Y.S.2d 97, 99. *That which has taken place, not what might or might mere supposition or opinion; a truth, as distinguished from fiction or error. Burrill, Circ.Ev.* 218. (Black's Law Dictionary 4th ed. Rev.)
(f) *<u>[H]ot pursuit:</u> means some sort of a chase, but need not be an extended hue and cry 'in and about (the) public streets.* {2020 U.S. Dist. LEXIS 13} *The immediate and continuous pursuit by police officers of a suspect whose possible escape justifies the failure of the officers to obtain a warrant before making an entry, search, seizure, or arrest . March 14,2022. online google search.*
(g) *<u>In hot pursuit :</u> following closely and eagerly. online google search.*
(h) *<u>FORCE</u>. Power dynamically considered, that is, in motion or in action; constraining power,*

*compulsion; strength directed to an end. Usually the word occurs in such connections as to show that unlawful or wrongful action is meant.* Watson v. Railway Co., 7 Misc.Rep. 562, 28 N.Y.S. 84; Plank Road Co. v. Robbins, 22 Barb., N.Y., 667; Temple Lumber Co. v. Living, Tex.Civ.App., 289 S.W. 746, 749; Hafner Mfg. Co. v. City of St. Louis, 262 Mo. 621, 172 S.W. 28, 34. *Unlawful violence. It is either simple, as entering upon another's possession, without doing any other unlawful act; compound, when some other violence is committed, which of itself alone is criminal; or implied, as in every trespass, rescous, or disseisin.* Lambert v. Helena Adjustment Co., 69 Mont. 510, 222 P. 1057, 1058. *It may mean either exact pressure times exact area to which the pressure is applied, or it may mean simply an operative physical power without taking account of the exact quantity applied.* Hydraulic Press Corporation v. Coe, 77 U.S.App.D.C. 251, 134 F.2d 49, 56. *Such display of physical power as is reasonably calculated to inspire fear of physical harm to those opposing possession of premises by trespasser.* Smith .v. Sinclair Refining Co., Tex.Civ.App., 77 S.W.2d 894, 895. *Terms "violence" and "force" are synonymous when used in relation to assault.* People v. James, 9 Cal.App.2d 162, 48 P.2d 1011, 1012. *Power statically considered; that is at rest, or latent, but capable of being called into activity upon occasion for its exercise. Efficacy; legal validity. This is the meaning when we say that a statute or a contract is "in force." As used in divorce statute, "force" or "coercion" are synonymous.* Santer v. Santer, 115 Pa. Super. 1, 174 A. 651, 652. *In old English law, a technical term applied to a species of accessary before the fact. In Scotch law, coercion; duress. Bell. —Of force.* See that title.(Black's Law Dictionary 4th ed. Rev.)

May the Court take Judicial Notice of the following facts:
In this case the officer did not verify driving privileges prior to the stop.
In this case the officer could not verify who was driving the truck before the stop.
In this case the officer lied in his statements.(Credibility).
In this case the officer admitted to profiling the defendant.(Credibility).
In this case due to the deputy's exhibition driving to seize the driver the stop started at that point.
In this case deputy prolonged the stop.
In this case deputy lied about the handling of the evidence.(Credibility).

Motion to suppress should be granted where defendant was charged with a crime after being

stopped for driving after a suspended license because the district court should discount testimony that

the deputy could see through mirror tape and tinted glass to identify the driver of the vehicle; therefore,

there is/was no reasonable articulable suspicion to stop the vehicle. Moreover, the stop could not have

continued where there was no reasonable suspicion to continue the stop and not just write a ticket and

not extend the stop *Rodriguez v. United States.* The officer did not provide a constitutional basis for the

additional intrusion of asking if there was any marijuana in the truck <u>before</u> searching the vehicle and

the State failed to show that any such request was made of defendant <u>beforehand</u> and whiten the

reasonable time aloud. *Rodriguez v. United States*, 575 U.S. 348, 350 (2015).

In *Rodriguez v. United States*, 575 U.S. 348, 350 (2015), the US Supreme Court stated: "we hold that a police stop exceeding the time needed to handle the matter for which the stop was made violates the constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefor, 'become[s] unlawful if it is prolonged beyond the reasonably required to complete th[e] mission' of issuing a ticket for the violation". In this case Thomas was held beyond a reasonable amount of time to preform the task of writing a ticket for a violation. The stop at 6:19 should have clearly been over, the deputy even says to himself while recording: "come on give me any thing." ( Gov Ex.1 at 6:17 – 6:19 and the back seat video same place). The deputy knows that this stop should be complete, but he returns with no ticket and plans to prolong the stop asking questions that have been answered already and were not needed to complete the writing of the violation at hand.

In *United States v. Gorman*, 859 F.3d 706 715 (9th Cir. 2017) the Courts held that "unrelated questioning prolonged the stop." While in *United States v. Macias*, 658 F.3d 509, 518 Ⅎ 19 (5th Cir. 2011) the courts deciding that... "questions violated the standard which says an officer can ask such questions only if they do not extend the duration of the stop." Clearly here in this case deputy Arcand had questioned Thomas with unrelated context, which shows effort to prolong the stop in clear violation of the Defendant's rights. In *United States v. Clark*, 902 F.3d 404, (3d Cir. 2018) the Court found that "20 seconds of unrelated questioning prolonged the stop." similarly In *this case;* Arcand talked to Thomas for approximately 6 minutes before running the Defendant's name and VIN. While searching truck on and off the duration of the entire 6 minutes. *State v. Dempsey*, 2008 Minn. App. Unpub. LEXIS 7 (Minn. Ct. App. Jan. 22, 2008).

In the Supreme Court Case *Alabama v. White*, 496 U.S. 325, 110 S. Ct. 2412, 110 L. Ed. 2D 301 (1990) The Court concluded "The same approach [to evidence in the probable cause context]

applies in the reasonable suspicion context, the only difference being the level of suspicion that must be established." In *this case;* Deputy Arcand claims that it took him "5:30 sec to smell marijuana" while conducting and unauthorized, unlawful search of the vehicle the entire time. You can here sniffing heavily and loudly in (government exhibits # 1&2 at 7:17) with a stuffy runny noise, and the temperature as it was below freezing. It is questionable whether the Deputy smelled marijuana at all considering Covid-19 being a factor and the potential that the Deputy Arcand had contracted Covid-19 prior to the stop.

In ***Illinois v. Gates***, 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983) The Supreme Court concluded "knowledge and reliability are not requirements to be rigidly exacted in every case, but are merely part of the, totality, considered for probable cause." However, in *this case;* the reliability and the knowledge of deputy Arcand both have conflicting characteristics to the recorded facts. These conflicts need to be considered when making the determination of credibility. Furthermore, *The "Fruit of the poisonous tree" doctrine provides that "evidence obtained directly or indirectly through the exploration of police illegality is inadmissible."* ***United States v. Simpson.***

No matter how solid Deputy Arcand believes his basis of knowledge to be, the information will not support a finding of probable cause unless it is reliable. This deputy prolonged this stop to the point that he could have written tickets for the truck tree times. Examples of this prolonged stop include Deputy Arcand knowing where the traveler was heading. Arcand knew all the information that he needed to write a ticket from 1:30 seconds into the stop however Arcand did not go back to the car until 6:10 seconds into the stop at which point he then returned when the vehcile and driver cleared the NCIC without any tickets. Deputy Arcand proceeded to ask more questions (example "are you going to get insurance"? Ect...), at that point Arcand had long over extended the stop necessary to cite the Drive for whatever "driving violation" had allegedly occurred. The stop should have been over at 3:50 seconds. The car was parked and on private property, nothing further to show suspicion about the truck

or Thomas with all of his great observation skills. He did not see the person sitting in the red truck right in front of him, and the person in the red truck was the person who had been there long before the blue truck had pulled into the yard that person could have easily dropped the bag of marijuana there, or anyone for that matter being that we don't know when the bag appeared. The deputy was snooping on a fishing exposition, also (ECF doc # 56) the pictures that were shown to the court show as even more evidence, that the government could not tell where the focus point of the photos are, and need added direction, by circling focal points in red ink for the court what need be examined. It is obvious the viewer would not be able to identify what the deputy had explained. The point being that there is no way to see the traveler, and that the stop is unjustifiable plus, the stop was prolonged beyond the reasonably allotted time to complete the mission of issuing a ticket, but because of the prolonged stop the fruits can not be admissible.

 **So in this case "Without the illegally obtained evidence from the traffic stop, the search warrant affidavit failed to establish probable cause to search the home"!**

In **_Rodriguez v. United States_**, 575 U.S. 348, 350 (2015), the US Supreme Court states "we hold that a police stop exceeding the time needed to handle the matter for which the stop was made violates the constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefor, 'become[s] unlawful if it is prolonged beyond the reasonably required time to complete th[e] mission' of issuing a ticket for the violation".


There was no reasonable articulable suspicion to justify a stop


*FACT. A thing done; an action performed or an incident transpiring; an event or circumstance; an actual occurrence. An actual happening in time or space or an event mental or physical. Fowler-Curtis Co. v. Dean, 203 App.Div. 317, 196 N.Y.S. 750, 754; German-American Ins. Co. v. Huntley, 62 Okl. 39, 161 P. 815, 817; Rost v. Kessler, 267 App.Div. 686, 49 N.Y.S.2d 97, 99. That which has taken place, not what might or might mere supposition or opinion; a truth, as distinguished from fiction or error. Burrill, Circ.Ev. 218.*

## <u>The defendant moves to dismiss with prejudice.</u>

Please forgive me if I may be informal as I do not practice law.

Respectfully,

Robbin Allen Thomas . de jure, divine being, in propria persona sui juris, in proprio solo, in

proprio heredes. All rights
exercised at all points in time. No CORPORATE entity, including CORPORATE courts has personam
jurisdiction over me or any moor. I am not in "joinder" with any person or CORPORATION. No
communication by me or about me can create a contract. Only my autograph along with the
other parties' signature that accompanies a written contract can create a contract, and that
autograph is non-negotiable if the autograph is not affixed to a set of signatures as described
herein. An '·adhesion" contract is an oxymoron as hidden elements vitiate a lawful contract.

Respectfully,

Executed this 13TH day of _May_ ,2022.

Affiant: Robbin Allen Thomas propria persona sui juris
flesh and blood, sentient man
ex rel: [ROBBIN THOMAS]
All rights and remedies reserved at all points in without recourse nunc pro tune
U.C.C. 1- 207/1-308; U.C.C.1-103
care of: Ecclesiastical Moors: P.O. Box 112163
[Tacoma, Washington territory]
Northwest Amexem