## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,                                  Case No. 21-cr-93 (JRT/TNL)

                Plaintiff,

v.                                                          **REPORT & RECOMMENDATION**

Robbin Allen Thomas,

                Defendant.

Alexander D. Chiquoine, Assistant United States Attorney, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for the Government);

Robbin Allen Thomas, #25412, Sherburne County Jail, 13880 Business Center Drive Northwest, Elk River, MN 55330 (pro se Defendant); and

Steven J. Wright, Law Office of Steven J. Wright, 331 Second Avenue South, Suite 705, Minneapolis, MN 55415 (standby counsel for Defendant).

## I. INTRODUCTION

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant Robbin Allen Thomas' Motion to Suppress Evidence Obtained by Search and Seizure, ECF No. 47, Pro Se Motion to Dismiss Due to Lack of Jurisdiction, ECF No. 89, and Pro Se Motion to Dismiss with Prejudice Defective Indictment, ECF No. 104.[1]  These motions have been referred to the undersigned for a report and recommendation to the district court, the Honorable John R. Tunheim, Chief District Judge of the United States

---

[1] Defendant's Motion to Suppress Evidence Obtained by Search and Seizure, ECF No. 47, was filed by Attorney F. Clayton Tyler when Defendant was represented by counsel.  The other motions were filed pro se by Defendant.

District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. Local Rule 72.1.

A hearing was held on Defendant's Motion to Suppress Evidence Obtained by Search and Seizure ("Suppression Motion") and Motion to Dismiss Due to Lack of Jurisdiction ("Jurisdiction Motion") on March 18, 2022. ECF No. 100. A hearing was held on Defendant's Motion to Dismiss with Prejudice Defective Indictment ("Indictment Motion") on April 26, 2022. ECF No. 118. Assistant United States Attorney Alexander D. Chiquoine appeared on behalf of the United States of America (the "Government"). Defendant Robbin Allen Thomas appeared pro se. Attorney Steven J. Wright appeared as standby counsel for Defendant. Post-hearing briefing is now complete, and these motions are ripe for a determination by the Court.

## II. FINDINGS

At the March 18 hearing, the Court heard testimony from Deputy Nathan Arcand, a licensed peace officer with the Anoka County Sheriff's Office. The Government offered and the Court received: Exhibit G-1, Deputy Arcand's squad car's dash camera video; Exhibit G-2, Deputy Arcand's body worn camera video; and Exhibit G-3, the search warrant. At the hearing, Defendant offered and the Court received: Exhibit D-1, an affidavit of fact in support of Defendant's jurisdiction argument; Exhibit D-2, a video in support of Defendant's jurisdiction argument; Exhibit D-3, Deputy Arcand's police report; Exhibits D-4 and D-5, photos of drugs on a scale; and Exhibit D-6, jurisdiction-related documents.

After the hearing, Defendant filed a Pro Se Motion to Add Exhibits, ECF No. 116. Defendant requested permission to introduce Exhibit D-7, Deputy Ben Fischer's body

worn camera video; Exhibit D-8, Deputy Arcand's squad car's rear camera video; and Exhibits D-9 through D-13, plat/land-related documents. The Court now receives those exhibits.[2] Based upon the file and documents contained therein, along with the testimony and exhibits presented, the undersigned Magistrate Judge makes the following findings.

### A. Background

Deputy Arcand has been employed with the Anoka County Sheriff's Office for approximately eight years. Tr. 26:8-27:12, 28:6-14, ECF No. 102.[3] Deputy Arcand works in the patrol division where his duties are to "respond to 911 calls, pro-actively patrol, respond to accidents, domestic assaults, so on and so forth, and conduct traffic enforcement." Tr. 27:25-28:5.

On February 19, 2021, Deputy Arcand was working a shift from 10:30 a.m. to 10:30 p.m. Tr. 28:16-23. At the beginning of his shift, Deputy Arcand's partner briefed him on a vehicle located at 3905 149th Avenue Northeast in Ham Lake, Minnesota ("Defendant's residence"). Tr. 33:11-14. Deputy Arcand's partner told him about "a vehicle he saw in the driveway that morning with a license plate that did not match the vehicle it was displayed on." Tr. 33:11-14. The officers suspected that the vehicle, a red pickup truck, may be stolen. Tr. 33:14-15, 37:9-13

Deputy Arcand testified that he and his agency were familiar with Defendant's residence, and it is known to them to be involved in criminal activities. Tr. 33:10-11,

---

[2] *See* Court's June 6, 2022 Order at ¶ 10, ECF No. 129.
[3] Although the transcript has been temporarily sealed to allow for the process of redacting any personal identifiers, *see generally* D. Minn. LR 5.5, any notice of intent to request redaction was due April 4, 2022, and no such notice was filed. ECF No. 102.

34:13-19. Prior to February 19, Deputy Arcand had gone to that address "for warrant arrests, calls for assaults, recovering stolen property, and multiple other 911 and emergency-related responses." Tr. 34:22-35:1; *see also* Tr. 83:9-14. Deputy Arcand testified that Defendant's residence is located on 149th Avenue, a public roadway within the jurisdiction of the Anoka County Sheriff's Department. Tr. 38:2-14; *see also* Tr. 136:17-19. He explained that there are two driveways on the property. Tr. 38:13-14, 42:9-14. The east driveway leads to a pole barn and the west driveway leads to the residence. Tr. 38:14-15.

Deputy Arcand also testified that he was familiar with the residents at that address. Specifically, Deputy Arcand knew that Defendant had been living at the residence since November or December of 2020, and that another person named John Peter Swanberg was also living there. Tr. 35:2-9, 83:15-84:2. Deputy Arcand had been to Defendant's residence and interacted with Defendant multiple times, including the three consecutive days leading up to February 19. Tr. 36:1-3, 82:17-83:5. These interactions included "prior warrant attempts or arrests at the address and a traffic stop from January of 2021." Tr. 35:10-16. Deputy Arcand estimated that he had personally interacted with Defendant six to ten times, and he was therefore familiar with Defendant and what he looked like. Tr. 35:10-22, 49:10-14, 82:10-16. Deputy Arcand described Defendant's demeanor during all of these prior interactions as "[p]olite and respectful and cooperative." Tr. 35:23-25.

Deputy Arcand was also aware that Defendant's driver's license was suspended. Tr. 36:16-18, 53:3-5. Deputy Arcand had run Defendant's name several times to investigate his driver's status and possible warrants, including in January of 2021 during a

4

traffic stop. Tr. 36:16-37:8. Deputy Arcand testified that he frequently ran Defendant's name in the days leading up to February 19, but he could not recall if he did so on February 19. Tr. 96:11-25. Deputy Arcand also testified that it is common practice for him to regularly run peoples' names to check if they have warrants if he knows of prior criminal activity and has reason to believe people are staying in certain locations. Tr. 97:2-6, 98:20-24.

### B. Initial Sighting of Vehicle

On February 19, at approximately 11:45 a.m., Deputy Arcand went to investigate the potential stolen red pickup truck at Defendant's residence. Tr. 28:16-29:4, 33:14-15. While patrolling the area on 149th Avenue, Deputy Arcand was driving his marked squad vehicle equipped with a dashboard camera. Tr. 29:6-13. As Deputy Arcand approached Defendant's residence, he saw the red pickup truck that his partner had informed him was displaying improper license plates. Tr. 37:9-13. Deputy Arcand ran the license plate in his system and drove further east of the residence to conduct surveillance and further investigate the registration. Tr. 37:13-15, 53:22-54:2.

Deputy Arcand then made a U-turn on 149th Avenue in order to face westbound toward Defendant's residence and continue his surveillance investigation. Tr. 37:16-20, 41:2-8, 54:3-9, 136:2-5. Before Deputy Arcand "could get into [his] typical parking position to conduct surveillance, [he] . . . observed a blue pickup truck[4] leaving the pole barn driveway, get onto 149th Avenue Northeast, [and] head westbound." Tr. 38:11-18;

---

[4] There is no dispute that the blue pickup truck was not the vehicle Deputy Arcand suspected to be stolen. Deputy Arcand testified that he knew the blue pickup truck was not the same truck he had discussed with his partner earlier that day. *See* Tr. 87:10-18 ("I knew right when I saw the truck pull out that it wasn't the red truck.").

*see also* Tr. 40:12-15, 42:15-21, 136:6-10.  The vehicle was about 450 feet away from Deputy Arcand.  Tr. 86:20-87:9.

Deputy Arcand accelerated to try to catch up to the vehicle and run its registration. Tr. 38:17-21, 136:11-13; *see also* Ex. G-1 at 00:07-00:25.  Deputy Arcand got close enough to the vehicle to see the driver of the vehicle and its registration.  Tr. 38:22-24, 87:19-24, 96:9-10, 136:14-19.  He looked inside the vehicle and at its mirrors and waited for the registration information to come back on his computer.  Tr. 87:24-88:1.

Deputy Arcand testified that he was able to identify the driver as Defendant as Defendant was turning from 149th Avenue into the west driveway of his residence.  Tr. 39:20-21, 88:1-2, 100:8-9, 101:6-103:23; *see also* Ex. G-1 at 00:28.  Deputy Arcand testified that "[a]t this point or right around this point, [he] was confident that the driver of the vehicle was [Defendant]."  Tr. 91:18-19.  According to Deputy Arcand, he can "get a pretty good view of the driver" by looking at a vehicle's rearview mirror, back window, and side window.  *See* Tr. 39:12-19.  He testified that though he had never seen Defendant in the blue pickup truck, he was "quite positive" Defendant was the driver, given that: (1) Defendant was known to frequent and stay at the residence; (2) he had met Defendant on several occasions; and (3) he knew what Defendant looked like, including his hairstyle, demeanor, height, weight, size, and skin tone.  Tr. 92:2-93:15; *see also* Tr. 38:25-39:19 (testifying that he was able to identify Defendant as the driver based on his "familiarity with the people at that address" and using "the mirrors of the vehicle to observe . . . different sides of their face or profile on the back of his head, the hair . . . ."); *see also* Tr. 137:7-20. He testified that he could see Defendant through the back window even with any tint that

6

it had.  *See* Tr. 88:3-6, 136:23-137:6.  Based on his observations, Deputy Arcand "was confident that this could be no other person than [Defendant]."  Tr. 92:11-12.  Deputy Arcand testified that he identified Defendant "right before [he] activated [his] emergency lights."  Tr. 88:22-23; *see also* Tr. 47:22-25, 84:18-21, 137:21-24

### C.  Traffic Stop

As mentioned, when Deputy Arcand caught up to the vehicle, it started to make a right-hand turn into the west driveway that leads to Defendant's residence.  Tr. 41:25-42:4, 42:22-43:13; *see also* Ex. G-1 at 00:24-00:28.  Deputy Arcand activated his emergency lights "right before or as [Defendant] was pulling into the west driveway leading to the house."  Tr: 39:22-40:7; *see also* Tr. 49:2.  He initiated a traffic stop because he knew Defendant "to have a suspended license, and he cannot be driving on 149th Avenue Northeast with a suspended license."  Tr. 40:8-11; *see also* Tr. 94:4-5.  Minnesota law makes it a misdemeanor offense to operate a motor vehicle if that person's driver's license has been suspended and the person has been given notice of or reasonably should know of the suspension.  *See* Minn. Stat. § 171.24, subd. 1; *see also, e.g., State v. Olson*, No. A15-1173, 2016 WL 3961732, at *2 (Minn. Ct. App. July 25, 2016) ("[A] person is guilty of . . . driving after suspension if: (1) the person's driver's license or driving privilege has been suspended; (2) the person has been given notice of or reasonably should know of the suspension; and (3) the person disobeys the order by operating . . . any motor vehicle . . . .").

### 1.  Initial Encounter

The vehicle came to a stop in the west driveway of Defendant's residence, near

where the red pickup truck was parked.  Tr. 48:12-14, 49:2-4; *see also* Ex. G-1 at 00:33. Deputy Arcand stopped his squad car behind the vehicle.  Tr. 48:11-12; *see also* Ex. G-1 at 00:35.  Defendant immediately opened his driver's side door.  Tr. 49:15-23, 139:1-7; *see also* Ex. G-1 at 00:33-00:35.  Deputy Arcand opened his door and told Defendant, "Hey, Robbin, stay in the truck."  Tr. 47:18-21, 49:4-6, 50:4-7; *see also* Ex. G-1 at 00:37-00:38; Ex. G-2 at 00:37-00:38.  Defendant then got out of the truck, Deputy Arcand again told him to "stay in the truck," and Defendant started walking towards Deputy Arcand's squad car, leaving his driver's door open.  Tr. 49:7-23, 139:1-7; *see also* Ex. G-1 at 00:39-00:48. Deputy Arcand testified that it was an officer safety concern for Defendant to approach his squad car.  Tr. 49:19-23.  He testified that his squad car is not somewhere that he can easily "find cover or concealment or engage a violent target."  Tr. 49:24-50:3.

Deputy Arcand told Defendant multiple times to go back to the car.  *See* Ex. G-1 at 00:50-00:53.  When he did not, Deputy Arcand got out of his squad car.  Tr. 52:19-23, 139.8-12.  Defendant told Deputy Arcand, "Come on man, you been harassing us."  Ex. G-2 at 00:51-00:55.  Deputy Arcand responded, "You don't got a license, man."  Tr. 52:24-53:2; *see also* Ex. G-2 at 00:56-00:57.  Deputy Arcand then walked with Defendant towards the blue pickup truck.  Tr. 139:13-15.  Deputy Arcand asked Defendant for his title and proof of insurance "and stuff."  Tr. 54:16-55:1; *see also* Ex. G-2 at 01:02-01:04. Defendant said, "Come on man, Arcand," and Deputy Arcand told him that he was not "trying to mess with" him.  *See* Ex. G-2 at 01:05-01:09.  Defendant said, "You are messing with me."  *See* Ex. G-2 at 01:09-01:11.  Defendant continued talking to Deputy Arcand about how he was harassing him.  *See* Ex. G-2 at 01:11-01:40.  Defendant then handed

Deputy Arcand some paperwork, including the title. Tr. 54:16-55:1.

Deputy Arcand reviewed the paperwork and discussed it with Defendant. Tr. 61:25-62:3. Defendant told Deputy Arcand that he just bought the vehicle yesterday from a private party. Ex. G-2 at 02:07-02:13; *see also* Tr. 62:10-13, 68:20-22. Deputy Arcand noticed that the title was listed to the name of Mark Winters, and he did not see any transfer paperwork filled out. Tr. 62:4-9, 68:23-25. Deputy Arcand testified that in order to have a title transferred to a new owner, there is a section on the title that the buyer would have to fill out. Tr. 62:4-9. Deputy Arcand testified that in his training and experience, when people do not fill out any portions of the title, they don't intend to transfer the title and will continue driving the vehicle registered in another person's name. Tr. 69:2-5. He testified that that is significant to him "because people oftentimes . . . fail to transfer the title to avoid law enforcement, whether they have a suspended license, prior criminal activities [or] contacts, or warrants." Tr. 69:2-9. Throughout the interaction, Defendant continued saying that Deputy Arcand was harassing him. *See, e.g.,* Ex. G-2 at 02:20-03:30. Defendant said things like, "Why you doing this man," "Come on man," "Man that's bogus," "You just seen me come from my shed to over here," and "You know it's me, man, you know it's me." *See* Ex. G-2 at 03:06-03:24. Deputy Arcand responded, "I know, that's why I stopped you." *See* Ex. G-2 at 03:24-03:26.

Deputy Arcand testified that Defendant's behavior was different during this interaction than any previous interaction he had with Defendant. Tr. 65:13-19. He described Defendant as "polite, cordial, respectful, and cooperative" in their previous interactions. Tr. 65:21-22. During this encounter, Deputy Arcand felt that Defendant was

not as cordial or cooperative, and his behavior was "different." Tr. 65:22-25. Deputy Arcand described Defendant as acting "erratic." Tr. 66:16-19; *see also* Tr. 138:14-24. Deputy Arcand explained that he considered Defendant's behavior to be erratic because it is concerning to a deputy when anyone gets out of a vehicle during a traffic stop and approaches a squad car. Tr. 106:15-21.

Deputy Arcand testified that Defendant's uncharacteristic behavior was significant to him because it made him believe that criminal activity was afoot. Tr. 66:20-24. Deputy Arcand felt that Defendant "was trying to hide something specifically [during this traffic stop] that he wouldn't have been in [Deputy Arcand's] past encounters with him." Tr. 66:23-67:1. Deputy Arcand was also suspicious because Defendant refused to sit back in the vehicle after being asked several times. Tr. 67:2-7. Because Defendant had immediately approached him at his squad car, tried to interact with him there instead of in the pickup truck, and refused to sit back in his vehicle, Deputy Arcand felt that Defendant was trying to draw him away from the blue pickup truck. Tr. 67:2-68:12.

While speaking with Defendant, Deputy Arcand observed a knife inside a sheath attached to Defendant's belt in plain view. Tr. 56:15-56:2. Deputy Arcand asked if he could take any knives off Defendant so he could feel more comfortable. Tr. 56:15-57:2; *see also* Ex. G-2 at 03:33-03:36. Deputy Arcand testified that knives create an officer safety concern because they can be used as a weapon against them. Tr. 57:3-6, 111:15-16. Deputy Arcand then removed the knife from Defendant's waistband without incident. Tr. 57:7-12; *see also* Ex. G-2 at 03:33-03:40. Deputy Arcand testified that he did not really feel any immediate threat from Defendant at the time. Tr. 111:22-24.

Deputy Arcand and Defendant continued speaking next to the driver's door of the blue pickup truck. *See* Ex. G-2 at 03:40-05:42. Deputy Arcand told Defendant that he did not know him very well, and Defendant responded, "You know me well enough . . . You come to my door . . . [We're] on first name basis. You drive by here and you guys watch me. It's like you're focused on me brother." *See* Ex. G-2 at 03:41-03:58. Deputy Arcand also talked to Defendant about the potentially stolen red truck on the property. Tr. 57:19-58:2; *see also* Ex. G-2 at 03:56-04:10. Deputy Arcand also asked Defendant why he was so upset, and Defendant responded, "Because I'm supposed to be somewhere." Ex. G-2 at 04:28-04:38. Deputy Arcand then wiped an area of the windshield of the blue pickup truck. Tr. 58:10-12. He testified that he was trying to view the VIN number on the dash of the vehicle to compare it to the VIN number on the title in his hands. Tr. 58:13-15. Deputy Arcand then started to walk back to his squad car. *See* Ex. G-2 at 05:38-05:50; Tr. 59:14-19.

Deputy Arcand testified that he noticed a smell of marijuana during the course of the traffic stop. *See, e.g.,* Tr. 60:14-20. As part of his training and experience, Deputy Arcand has been specially trained in the odor of marijuana. Tr. 60:21-23. Deputy Arcand has been through a formal marijuana burn, where he was trained to smell the difference between fresh leaf marijuana and burnt marijuana. Tr. 60:23-25. He recognized those smells during his traffic stop with Defendant. Tr. 61:1-3.

Deputy Arcand testified that he first noticed a smell of marijuana "while talking with [Defendant] outside the vehicle and while [he] was at the driver's door reviewing the VIN." Tr. 60:14-20; *see also* Tr. 68:13-16. Specifically, he recognized a marijuana smell

11

"when [he] was speaking with [Defendant] up by the vehicle where [the video shows] the dog sitting in the driver's seat. So [Defendant] is on [Deputy Arcand's] left side and the vehicle door is on [Deputy Arcand's] right side." Tr. 61:4-9. Deputy Arcand could not identify the exact moment on his squad camera video or body camera video where he first noticed the smell of marijuana, but rather testified that "over the period of dealing with him and conducting [the] traffic investigation, the odor of marijuana was present." Tr. 139:21-25; *see also* Tr. 141:4-6 (stating that he cannot identify with 100 percent certainty at exactly what point he smelled marijuana). He testified that by the time he was checking the VIN and registration information, prior to going back to his squad car to run the checks, he had smelled the odor of marijuana coming from both Defendant and the vehicle. Tr. 141:17-142:4. According to Deputy Arcand, he did not mention noticing the smell of marijuana to Defendant because he did not have a backup officer with him and he generally waits to confront suspects about illegal issues until he has backup. Tr. 61:10-24.

When Deputy Arcand went back to his squad car, he ran Defendant and the VIN through NCIC, the national database that would show whether a person has a warrant and their driver's status. Tr. 62:21-63:6. Deputy Arcand also did a local record check. Tr. 62:24-63:2. The database showed that Defendant was clear of warrants, but that his license was suspended. Tr. 63:7-14.

While Deputy Arcand was in his squad car running those checks, Defendant was "wandering freely," going out of Deputy Arcand's viewpoint several times and walking in front of the blue pickup truck he had been driving. Tr. 64:10-20. From where he was positioned in his squad car, Deputy Arcand could not see Defendant at times. Tr. 64:17-

12

65:4.  Deputy Arcand testified that he believes Defendant crouched down at some point because Deputy Arcand could not see his head through the window either.  Tr. 64:25-65:4.

## 2.  Discovery of Marijuana, Initial Vehicle Search, and Arrest

Deputy Arcand exited his squad car and walked back to the blue pickup truck.  *See* Ex. G-2 at 07:22-07:35.  Defendant was standing in front of the truck.  *See* Ex. G-2 at 07:35.  Deputy Arcand and Defendant discussed the title paperwork and his purchase of the vehicle, and Defendant continued saying that Deputy Arcand was harassing him.  *See* Ex. G-2 at 07:35-10:42.  Anoka County Sheriff's Deputy Ben Fischer then arrived to assist Deputy Arcand.  Tr. 69:16-70:2; *see also* Ex. G-2 at 10:11.

Deputy Arcand then asked Defendant whether he had any marijuana on him.  Tr. 70:23-25, 73:10-11; *see also* Ex. G-2 at 10:41-10:43.  Defendant said, "No, there's some over here."  *See* Ex. G-2 at 10:43-10:45; Tr. 71:2-3, 73:11-12.  Defendant then led Deputy Arcand a few steps to the front of the blue pickup truck and pointed to the ground.  *See* Ex. G-2 at 10:45-10:50; Tr. 72:2-5, 73:12-13.  Deputy Arcand located a small, clear plastic baggie that contained a green leafy-like substance, consistent with marijuana.  Tr. 72:6-8. Deputy Arcand asked, "That came out of your pocket?"  *See* Ex. G-2 at 10:49-10:50; *see also* Tr. 73:13-15.  Defendant said, "Did not come out of my pocket."  *See* Ex. G-2 at 10:50-10:52; *see also* Tr. 73:15-21.  Deputy Arcand picked it up and asked, "That's what I smell?"  *See* Ex. G-2 at 10:50-10:56.  Deputy Arcand told Defendant that he had smelled the marijuana and "that's why [he] think[s] [Defendant] walked away from the vehicle." *See* Ex. G-2 at 11:01-11:05.

Deputy Arcand testified that he noticed that the baggie of marijuana appeared to be

clean and not weathered.  Tr. 74:4-7.  He testified that, based on his training and experience, the baggie had not been outside for an extended period of time and had not been driven over on a driveway.  Tr. 74:7-9.  According to Deputy Arcand, that made him believe the baggie of marijuana came from Defendant's person.  Tr. 74:7-10.  Further, Deputy Arcand testified that he did not observe anybody other than Defendant in, or standing in front of, the blue pickup truck throughout the traffic stop.  Tr. 74:11-14.  Deputy Arcand then searched Defendant's person, looking for other marijuana, narcotics, or other paraphernalia.  Tr. 75:4-8; *see also* Ex. G-2 at 11:17-13:06.  Deputy Arcand did not find anything illegal from the search.  Tr. 75:9-10.

Based on the odor of marijuana coming from the vehicle, Deputy Arcand conducted a search of the blue pickup truck.  Tr. 75:11-12, 112:17-18; *see also* Ex. G-2 at 13:14-13:30.  He opened the center console and located a holster for a handgun.  Tr. 75:15-16. Between the driver's seat and the center console area, he located a handgun.  Tr. 75:17-20. He testified that he found the handgun within the first 30 seconds or minute of searching the vehicle.  Tr. 76:3-7.  Deputy Arcand testified that he used his right hand to search and retrieve the handgun he located and his left hand to brace himself on the seat.  Tr. 11:10-19; *see also* Ex. G-2 at 13:14-13:30 (showing Deputy Arcand's left hand resting on the steering wheel and his right hand searching the center console and area between the driver's seat and the center console).

Deputy Arcand then secured Defendant in handcuffs and advised Defendant that he was under arrest.  Tr. 76:16-19.  Defendant asked why he was being handcuffed, and Deputy Arcand told him it was because there was a gun in the car.  *See* Ex. G-2 at 13:35-

14:34.  Deputy Arcand was aware that Defendant had felony convictions which make him ineligible to possess a firearm.  Tr. 76:8-15; *see also, e.g.,* Minn. Stat. §§ 624.713, subd. 1(2), 1(10)(i).  According to Deputy Arcand, Defendant did not resist arrest.  Tr. 121:21-122:4.

Deputy Arcand went back to the blue pickup truck and retrieved the handgun.  *See* Ex. G-2 at 15:44.  He later ran the handgun's serial number through dispatch to see if the handgun was stolen, which is common practice when law enforcement officers recover firearms.  Tr. 75:21-24.  Deputy Arcand discovered that the handgun was stolen.  Tr. 75:25-76:2.

### 3.  Continuation of Vehicle Search

Deputy Arcand then continued searching the blue pickup truck.  Tr. 76:20-22; *see also* Ex. G-2 at 19:06.  He located a lunchbox that had a plastic baggie with a green leafy substance, consistent with marijuana.  Tr. 76:23-77:1; *see also* Ex. G-2 at 20:10.  He also located a handgun magazine, two packages of suspected methamphetamine, and another small plastic baggie with a green leafy substance consistent with marijuana inside a bag. Tr. 77:1-6; *see also* Ex. G-2 at 20:58-24:11.

Deputy Fischer stood with Defendant while Deputy Arcand searched the vehicle. *See generally* Ex. D-7 at 04:08-10:00.  Deputy Fischer then searched Defendant incident to arrest and placed him in the back of Deputy Arcand's squad car.  *See* Ex. D-7 at 10:00-15:17.  Deputy Fischer also searched the vehicle and advised Deputy Arcand that he had located another large amount of white crystallized-like substance in plastic bags inside a duffel bag in the backseat area of the vehicle.  Tr. 77:7-11; *see also* Ex. G-2 at 28:07.  That

substance field tested positive for methamphetamine.  Tr. 77:12-14.

While in the back of Deputy Arcand's squad car, Defendant stated that the search of his vehicle was illegal.  *See* Ex. D-8 at 24:56-25:10.  He later appeared to close his eyes and rest his head on the door or backseat.  *See generally* Ex. D-8.  He then appeared to start shaking.  *See* Ex. D-8 at 35:39.  Deputy Arcand asked Defendant multiple times if he was alright.  *See, e.g.,* Ex. D-8 at 36:26, 36:37.  Deputy Arcand and Deputy Fischer pulled Defendant out of the car and provided medical assistance.  *See* Ex. D-8 at 37:15-47:07; Ex. D-7 at 28:01-38:00; Ex. G-2 at 36:36-47:17.  Other emergency personnel responded to assist Defendant.  *See* Ex. G-2 at 44:06.

### D.  Search Warrant and Residence Search

Other officers later applied for and received a search warrant to search Defendant's residence.  Tr. 77:15-18; *see also generally* Ex. G-3.  Deputy Arcand later assisted in executing the search warrant.  Tr. 78:14-16.  He secured people that were in the residence while the warrant was executed, but was otherwise not involved in looking for the items listed in the warrant.  Tr. 78:14-24.

### III. CONCLUSIONS OF LAW

Based upon the foregoing findings, the undersigned makes the following conclusions of law.  With respect to Defendant's Suppression Motion, ECF No. 47, Defendant argues that (1) Deputy Arcand lacked the requisite reasonable, articulable suspicion to perform a traffic stop of the vehicle, (2) Deputy Arcand impermissibly extended the scope of the stop without a sufficient basis to do so, (3) Deputy Arcand performed a warrantless search of the vehicle with no exception to the warrant requirement,

16

and (4) the search warrant affidavit failed to establish a nexus between the place to be searched and the items sought.  Defendant also argues that the Court should dismiss the case for lack of jurisdiction as this Court has no jurisdiction over him.  *See* Def.'s Jurisdiction Motion, ECF No. 89.  Lastly, Defendant argues that the Court should dismiss the indictment with prejudice due to a "fatal flaw on [the] indictment."  *See* Def.'s Indictment Motion, ECF No. 104.

### A. Traffic Stop

"The Fourth Amendment prohibits 'unreasonable searches and seizures.'"  *Heien v. North Carolina*, 574 U.S. 54, 57 (2014); *accord United States v. Hollins*, 685 F.3d 703, 705 (8th Cir. 2012); *see also* U.S. Const. amend. IV.  "A traffic stop for a suspected violation of law is a 'seizure' of the occupants of the vehicle and therefore must be conducted in accordance with the Fourth Amendment."  *Heien*, 574 U.S. at 60; *accord United States v. Holly*, 983 F.3d 361, 364 (8th Cir. 2020); *Hollins*, 685 F.3d at 705.

> A traffic stop must be supported by reasonable suspicion or probable cause. A law enforcement officer has reasonable suspicion when the officer is aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed.  Any traffic violation, however minor, provides probable cause for a traffic stop.

*Hollins*, 685 F.3d at 706 (quotations and citations omitted); *see also, e.g.*, *Holly*, 983 F.3d at 364 ("It is well established that *any* traffic violation, regardless of its perceived severity, provides an officer with probable cause to stop the driver.") (quotation omitted); *United States v. Frasher*, 632 F.3d 450, 453 (8th Cir. 2011) ("A traffic violation, however minor,

provides probable cause sufficient to satisfy the constitutional reasonableness requirement.").

"Probable cause also exists when a reasonable officer, confronted with the facts known to the officer at the time of the stop, could have believed that there was a fair probability that a violation of law had occurred." *Holly*, 983 F.3d at 364 (quotation omitted). Thus, "'[e]ven an officer's incomplete initial observations may give reasonable suspicion for a traffic stop,' and '[m]istakes of law or fact, if objectively reasonable, may still justify a valid stop.'" *Id.* (quoting *Hollins*, 685 F.3d at 706) (second alteration in original). "[A] traffic stop comports with the Constitution when the officer reasonably believes that the vehicle has committed a traffic infraction, even if the vehicle did not actually commit such an infraction." *United States v. Miller*, 915 F.3d 1207, 1209 (8th Cir. 2019); *see Holly*, 983 F.3d at 364 ("'To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them fair leeway for enforcing the law in the community's protection.'") (quoting *Heien*, 574 U.S. at 60-61) (internal quotation marks omitted).

"[I]f an officer has reasonable suspicion or probable cause to stop for a traffic violation, 'any ulterior motivation on the officer's part is irrelevant.'" *United States v. McLemore*, 887 F.3d 861, 864 (8th Cir. 2018) (quoting *United States v. Fuehrer*, 844 F.3 767, 772 (8th Cir. 2016)); *see also, e.g.*, *United States v. Gunnell*, 775 F.3d 1079, 1083 (8th Cir. 2015); *Frasher*, 632 F.3d at 453. The officer's "'[s]ubjective intentions play no role in ordinary probable-cause Fourth Amendment analysis.'" *Gunnell*, 775 F.3d at 1083 (alteration in original) (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)); *see*

*also Fuehrer*, 844 F.3d at 772. "Similarly, it is irrelevant that the officer would have ignored the violation but for his ulterior motive." *Frasher*, 632 F.3d at 453; *accord Fuehrer*, 844 F.3d at 772; *Gunnell*, 775 F.3d at 1083.

Defendant first seems to argue that Deputy Arcand had no right to stop Defendant, whether Deputy Arcand initiated the stop while Defendant was on 149th Avenue or in the west driveway of his residence, because "one do[es] not need a drivers license to travel on their own property being there was no plat or easement for the property." Def.'s Resp. at 11, ECF No. 117; *see also* Def.'s Indictment Motion at 3 (arguing that "we do not need a driver's license to operate a vehicle on one's own property"). Defendant included several property-related exhibits in support of his argument. *See* Ex. D-9-13, ECF No. 115-1. Exhibit D-9 is a document that says, "This parcel is not platted or the plat is not available on-line. Please contact Anoka County Property Records & Taxation with further questions . . . ." *See* Ex. D-9. Exhibit D-10 is a document that states, "UNPLATTED HAM LAKE TWP SW 1/4 OF SE 1/4 /EX W 20 ACRES THEREOF/ 23 32 23." *See* Ex. D-10. Exhibits D-11 through D-13 appear to be printouts of parcel information for Defendant's residence at 3905 149th Avenue Northeast. *See* Ex. D-11-13. The Court interprets Defendant's contentions and exhibits as arguing that because 149th Avenue is not a public roadway, driving on his own private property without a valid license was not a criminal offense. As such, Defendant argues, Deputy Arcand was not permitted to conduct a traffic stop.

First, the Court does not find Defendant's Exhibits 9 through 13, which purportedly establish that 149th Avenue is not a public road, to be credible or persuasive. The documents do not even suggest that 149th Avenue is not a public road. If anything, the

documents seem to demonstrate that the "residential single family" home at "3905 149th Ave NE" is unplatted. *See* Ex. 10-11. Defendant's exhibits, however, do not demonstrate that 149th Avenue is not a public roadway. Nonetheless, even assuming that 149th Avenue is not a public roadway, the Court finds that Deputy Arcand was justified in initiating the traffic stop. "An officer's mistake of law or fact may justify a stop so long as that mistake is objectively reasonable." *United States v. Foster*, 15 F.4th 874, 877 (8th Cir. 2021) (citing *United States v. Hanel*, 993 F.3d 540, 543 (8th Cir. 2021)). Deputy Arcand testified credibly that 149th Avenue is a public roadway within the jurisdiction of the Anoka County Sheriff's Department. Tr. 38:2-7; *see also* Tr. 136:17-19. Even if that was a mistake of fact or law, it was a reasonable mistake. Deputy Arcand has been employed with the Anoka County Sheriff's Office for approximately eight years. Tr. 26:8-27:12, 28:6-14. He is a patrol officer and presumably conducts regular traffic enforcement on the highways and roads in Ham Lake. *See* Tr. 27:25-28:5. Based on his training and experience, the Court finds that it was objectively reasonable for Deputy Arcand to believe that he can conduct a traffic stop for a violation that occurred on 149th Avenue. Thus, even if he was mistaken, the stop was still justified.

Further, even if Deputy Arcand initiated the traffic stop after Defendant had fully turned into the west driveway of his residence, the stop was not improper. An officer is permitted to stop a vehicle in a private driveway after observing the vehicle commit a traffic violation on a public highway. *See, e.g., United States v. Miller*, 20 F.3d 926, 928-31 (8th Cir. 1994); *see also United States v. Corn*, No. 16-00097-01-CR-W-DGK, 2017 WL 1312975, at *2-3 (W.D. Mo. Mar. 20, 2017), *report and recommendation adopted*, 2017

20

WL 1316939 (W.D. Mo. Apr. 5, 2017) (finding stop proper where officer observed the defendant make a right turn into a driveway without signaling and following the vehicle into the driveway).

Defendant also argues that Deputy Arcand did not have reasonable suspicion or probable cause to stop Defendant's vehicle because Deputy Arcand "could not see who was driving the truck before making the stop." Def.'s Reply Mem. at 2, ECF No. 125; *see also* Def.'s Support Affidavit at 2, ECF No. 121; *see also generally* Def.'s Mem., ECF No. 115. Defendant argues that Deputy Arcand would not have been able to see Defendant before stopping him for several reasons, including: (1) the side mirror that Deputy Arcand allegedly identified him through had tape on it; and (2) the rear window view was obstructed because the window was tinted, the sun was glaring in the window, two reflective decals were placed where the head of the vehicle operator would be, and there was a dog in the backseat blocking the view of the driver's head. *See* Def's Reply Mem. at 2-5; Def.'s Mem. at 1-4. Defendant also argues that Deputy Arcand profiled Defendant. *See* Def.'s Mem. at 1, 4.

The Court finds credible Deputy Arcand's testimony that he identified the driver of the blue pickup truck as Defendant prior to initiating the traffic stop. It is true that the squad camera video shows the back window is at least somewhat tinted and there is a window decal on the upper left corner of the truck's rear window. It is also true that the enhanced photos Defendant submitted appear to show that the side mirror had some sort of tape or other lines on it. *See, e.g.,* Def.'s Support Affidavit at 11. But, it is also true that the video is not inconsistent with Deputy Arcand's testimony that he was able to "get a

pretty good view of the driver" by looking through each of the windows. *See* Tr. 39:12-21, 88:1-2, 100:8-9, 101:6-103:23; *see also generally* Ex. G-1; *see also Holly*, 983 F.3d at 364 ("[T]here is no extrinsic evidence that clearly contradicts the officers' account, nor was the officers' testimony so internally inconsistent or implausible on its face that a reasonable fact-finder would not credit it.") (quotation omitted). The video shows Deputy Arcand's squad car catch up to the blue pickup truck. Deputy Arcand seemed to have a clear view of the pickup truck's side mirror and a person can be seen through the rear window driving the vehicle. The video footage does not depict any tape or other obstruction on the pickup truck's side mirror. *See, e.g.,* Ex. G-2 at 05:20-05:22. And even if the side mirror did have some sort of tape on it, the Court has no reason to believe Deputy Arcand would not have been able to identify Defendant using that mirror and the other mirrors and windows of the vehicle. Deputy Arcand is a trained police officer who routinely conducts traffic stops and is familiar with using vehicle mirrors to observe a driver's face, head, and hair. *See* Tr. 38:25-39:19; *see also* Tr. 27:25-28:5.

In addition to what Deputy Arcand was able to see through the vehicle's mirrors and windows, he also had the context of having been to Defendant's property and interacting with Defendant several times recently, including in the three days leading up to the traffic stop. *See* Tr. 35:10-22, 36:1-3, 82:17-83:5. Thus, Deputy Arcand was familiar with the fact that Defendant was known to frequent and stay at the residence, and what Defendant looked like, including his hairstyle, demeanor, height, weight, size, and skin tone. Tr. 92:2-93:15. Deputy Arcand and Defendant seemed to acknowledge this fact during the traffic stop. *See, e.g.,* Ex. G-2 at 03:06-03:24 (Defendant telling Deputy Arcand, "You know it's

me, man, you know it's me."); *see also* Ex. G-2 at 03:24-03:26 (Deputy Arcand responding,
"I know, that's why I stopped you."). The Court credits Deputy Arcand's testimony and
finds that based on all of the circumstances and his observations, it was reasonable for
Deputy Arcand to be "confident that [the driver] could be no other person than
[Defendant]." Tr. 92:11-12. The Court also finds credible Deputy Arcand's testimony that
he was aware that Defendant's driver's license status was suspended prior to conducting
the traffic stop, and that he therefore witnessed Defendant commit the traffic violation of
driving after suspension under Minnesota law. Deputy Arcand testified credibly that he
ran Defendant's name several times in the days leading up to the traffic stop and knew his
license status to be suspended. *See* Tr. 36:16-18, 53:3-5, 96:11-25.

      Because Deputy Arcand's testimony was credible and his belief that Defendant was
driving a motor vehicle with a suspended license in violation of Minnesota law was
objectively reasonable, Deputy Arcand had probable cause for the traffic stop. *See Holly*,
983 F.3d at 364; *Miller*, 915 F.3d at 1209; *Hollins*, 685 F.3d at 706. And, because the
traffic stop was supported by probable cause, any of Deputy Arcand's subjective
motivations for the stop are irrelevant and need not be addressed by this Court. *See Whren*,
517 U.S. at 813; *McLemore*, 887 F.3d at 864; *Frasher*, 632 F.3d at 453. Accordingly, the
Court recommends that Defendant's motion to suppress be denied.

### B. Extension of the Stop

      Defendant next argues that even if the traffic stop were valid, Deputy Arcand
impermissibly extended the scope of the stop without a sufficient basis to do so. *See* Def.'s
Mem. at 10. Defendant argues that Deputy Arcand "prolonged this stop to the point that

he could have written tickets for the truck three times . . . [and] he knew all the information that he need[ed] to write a ticket from 1:30 seconds into the stop." *Id*.

"[A] constitutionally permissible traffic stop can become unlawful if it is prolonged beyond the time reasonably required to complete its purpose." *Hollins*, 685 F.3d at 706 (quotation omitted); *see, e.g.*, *United States v. Soderman*, 983 F.3d 369, 374 (8th Cir. 2020); *United States v. Sanchez*, 955 F.3d 669, 674 (8th Cir.), *cert. denied*, 141 S. Ct. 930, 2020 WL 7132622 (2020); *see also Rodriguez v. United States*, 575 U.S. 348, 354-55 (2015). "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez*, 575 U.S. at 354 (citations omitted); *see, e.g.*, *Soderman*, 983 F.3d at 374 ("An officer may lawfully continue a traffic stop until 'tasks tied to the traffic infraction are—or reasonably should have been—completed.'") (quoting *Rodriguez*, 575 U.S. at 354).

"After a law enforcement officer initiates a traffic stop, the officer 'may detain the offending motorist while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation.'" *United States v. Quintero-Felix*, 714 F.3d 563, 567 (8th Cir. 2013) (quoting *United States v. Barragan*, 379 F.3d 524, 528 (8th Cir. 2004)). "These tasks include a computerized check of the vehicle's registration and the driver's license and criminal history, as well as the preparation of a citation or warning." *Id.*; *accord Fuehrer*, 844 F.3d at 772; *United States v. Anguiano*, 795 F.3d 873, 876 (8th Cir. 2015); *see also Rodriguez*, 575 U.S. at 355-56. An officer may also ask travel-related questions. *See, e.g.*, *United States v. Espinoza*, 885 F.3d 516, 523 (8th Cir. 2018). "The

24

seizure remains lawful only so long as unrelated inquiries do not measurably extend the duration of the stop." *Rodriguez*, 575 U.S. at 354 (quotation omitted).

"[O]nce an officer finishes these tasks, the purpose of the traffic stop is complete and further detention of the driver or vehicle would be unreasonable, unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify further detention . . . ." *Quintero-Felix*, 714 F.3d at 567 (quotation omitted); *accord Fuehrer*, 844 F.3d at 772-73; *see also Rodriguez*, 575 U.S. at 354. "[I]f the response of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions." *United States v. Jones*, 269 F.3d 919, 926-27 (8th Cir. 2001) (quotation omitted); *see Anguiano*, 795 F.3d at 876 ("[I]f the investigating officer discovers information leading to reasonable suspicion, he may justifiably extend the stop."). "Only when an officer develops a reasonable, articulable suspicion that criminal activity is afoot does he have justification for a greater intrusion unrelated to the traffic offense." *Jones*, 269 F.3d at 927 (quotation omitted); *accord United States v. Bloomfield*, 40 F.3d 910, 918 (8th Cir. 1994) ("If, during a traffic stop, an officer develops a reasonable, articulable suspicion that a vehicle is carrying contraband, he has justification for a greater intrusion unrelated to the traffic offense.") (quotation and footnote omitted).

Reasonable suspicion "requires that the officer's suspicion be based upon particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." *Jones*, 269 F.3d at 927 (quotation omitted); *see also Sanchez*, 955 F.3d at 674 ("The reasonable suspicion

inquiry asks whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing.") (quotation omitted). "While reasonable suspicion must be more than an inchoate hunch, the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory stop." *United States v. Riley*, 684 F.3d 758, 763 (8th Cir. 2012) (quotation omitted); *see also United States v. Davis*, 943 F.3d 1129, 1132 (8th Cir. 2019) ("A reasonable suspicion is some minimal, objective justification for suspicion beyond an inchoate hunch.") (quotation omitted).

> In evaluating whether a set of facts would give rise to reasonable suspicion, this court must look at the totality of the circumstances and not just each independent fact standing alone. Furthermore, the court may consider any added meaning that certain conduct might suggest to experienced officers in the field, trained in the observation of criminal activity.

*Jones*, 269 F.3d at 927 (citation omitted); *accord Bloomfield*, 40 F.3d at 918. Courts "evaluate whether police had reasonable suspicion to extend a traffic stop based on the totality of the circumstances." *Davis*, 943 F.3d at 1132; *see Sanchez*, 955 F.3d at 674-75.

Defendant argues that Deputy Arcand impermissibly expanded the initial scope of the stop because "he knew all the information that he need[ed] to write a ticket from 1:30 seconds into the stop, but did not go back to the car until 6:10 seconds [and] then he returned after the truck cleared the NCIC without any tickets, and start[ed] asking more questions . . . ." Def.'s Mem. at 10; *see also* Def.'s Reply Mem. at 8-9. However, as the Government contends, and this Court agrees, Deputy Arcand's traffic stop was lawful:

> In total, approximately seven minutes elapsed between Deputy Arcand stopping [Defendant] and his return to the truck after confirming [Defendant's] suspended license. During this time, [Defendant] delayed Deputy Arcand's investigation by protesting the stop, accusing Deputy Arcand of harassment, answering his phone, and being unable to produce the

26

truck-related paperwork Deputy Arcand requested. Deputy Arcand
explained his reason for the stop and responded to [Defendant's] allegations
of harassment. He asked [Defendant] questions related to his ownership of
the vehicle, its registration, and his driving status. He also removed knives
from [Defendant's] belt for officer safety. Ultimately, Deputy Arcand went
to his squad where he discovered that the truck's registration was expired and
confirmed that [Defendant's] license was suspended before returning to
speak further with [Defendant].

Gov't's Post Hearing Mem. in Opp. at 20, ECF No. 122 (citations omitted). Throughout

the traffic stop, Deputy Arcand was completing tasks tied to the traffic infraction, such as

getting and checking Defendant's vehicle-related documents and running his information

through his system. *See Rodriguez*, 575 U.S. at 354. Because Deputy Arcand was

completing tasks tied to the traffic infraction in a reasonable amount of time, the Court

finds that the scope and duration of the stop was reasonable.

The Court also finds that Deputy Arcand was justified in further detaining

Defendant beyond completing tasks tied to the traffic infraction because he had reasonable

suspicion that additional criminal activity was afoot. *See Jones*, 269 F.3d at 927 (noting

that an officer has justification for a greater intrusion unrelated to the traffic offense when

the officer develops "reasonable, articulable suspicion that criminal activity is afoot");

*Bloomfield*, 40 F.3d at 918 ("If, during a traffic stop, an officer develops a reasonable,

articulable suspicion that a vehicle is carrying contraband, he has justification for a greater

intrusion unrelated to the traffic offense.") (quotation and footnote omitted); *see also*

*Quintero-Felix*, 714 F.3d at 567. Deputy Arcand testified that he has been trained in the

odor of marijuana and that he can smell the difference between fresh leaf marijuana and

burnt marijuana. Tr. 60:21-25. Deputy Arcand testified credibly that he noticed the smell

of marijuana "while talking with [Defendant] outside the vehicle and while [he] was at the driver's door reviewing the VIN." Tr. 60:14-20; *see also* Tr. 68:13-16. He also testified that the odor of marijuana was present "over the period of dealing with [Defendant] and conducting [the] traffic investigation," and that he smelled the odor of marijuana coming from both Defendant and the vehicle. Tr. 139:21-25, 141:17-142:4. Deputy Arcand also testified credibly that he felt like Defendant was trying to draw him away from the blue pickup truck because Defendant immediately approached him at his squad car, tried to interact with him there instead of at the pickup truck, and refused to sit back in the pickup truck. Tr. 67:2-68:12. Deputy Arcand also felt that Defendant "was trying to hide something specifically [during this traffic stop] that he wouldn't have been in [Deputy Arcand's] past encounters with him." Tr. 66:23-67:1. Based on all the circumstances, Deputy Arcand reasonably believed that criminal activity was afoot. *See* Tr. 66:20-24.

The Court concludes that, under the totality of the circumstances and based on his training and experience, Deputy Arcand had reasonable suspicion to believe Defendant was involved in criminal activity no later than the point at which he was completing the routine checks of Defendant and his vehicle's information in connection with the traffic stop. Deputy Arcand was therefore justified in extending the duration of the traffic stop to investigate his suspicions. *See United States v. Smith*, 789 F.3d 923, 928-29 (8th Cir. 2015) (holding that is lawful to prolong a traffic stop based on the smell of marijuana along with credible testimony by the officer involved). Accordingly, the Court recommends that Defendant's motion to suppress be denied.

### C. Warrantless Search of the Vehicle

Defendant argues that the search of the blue pickup truck was improper because it was not supported by probable cause, the officers did not obtain a warrant before conducting the search, and no exception to the warrant requirement existed. *See* Def.'s Suppression Motion at 2. Defendant contends "that the deputy did not smell any marijuana what so ever [sic] in the car until he opened the cooler" during the warrantless search. *See* Def.'s Mem. at 5.

"Under the 'automobile exception' to the Fourth Amendment, police may conduct a warrantless search of a vehicle if there is probable cause to believe that the vehicle contains contraband or other evidence of a crime." *United States v. Winarske*, 715 F.3d 1063, 1068 (8th Cir. 2013). This includes the trunk and containers in the vehicle. *See, e.g.*, *Arizona v. Gant*, 556 U.S. 332, 347 (2009) ("If there is probable cause to believe a vehicle contains evidence of criminal activity, *United States v. Ross*, 456 U.S. 798, 820-21 (1982), authorizes a search of any area of the vehicle in which the evidence might be found." (citations omitted)); *United States v. Walker*, 840 F.3d 477, 483 (8th Cir. 2016) (trunk); *United States v. Brooks*, 715 F.3d 1069, 1075 (8th Cir. 2013) (containers). "Probable cause for a search under the automobile exception exists if the facts and circumstances known to the officers when they began the search were sufficient in themselves for a person of reasonable caution to believe that contraband or evidence of criminal activity was present in the vehicle." *Walker*, 840 F.3d at 483.

With respect to marijuana, the Eighth Circuit "has held numerous times that the smell of marijuana coming from a vehicle during a proper traffic stop gives an officer

probable cause to search for drugs." *Smith*, 789 F.3d at 928-29 (citations omitted); *see also United States v. Williams*, 955 F.3d 734, 737 (8th Cir. 2020) ("We have repeatedly held that the odor of marijuana provides probable cause for a warrantless search of a vehicle under the automobile exception.") (citations omitted). "[T]he smell of marijuana, along with the credible testimony by the officer, is sufficient to establish probable cause to search an automobile and its contents." *Id*. Further, the discovery of marijuana gives officers probable cause to search a vehicle under the automobile exception to the warrant requirement. *See United States v. Davis*, 569 F.3d 813, 817-18 (8th Cir. 2009) ("If there had been any doubt about whether the smell of smoldering cannabis constituted probable cause to search the vehicle, such doubt was obviated by the discovery of a bag of marijuana in [the defendant's] pocket.").

Here, as discussed above, Deputy Arcand testified credibly that he smelled marijuana coming from both Defendant and the vehicle. Tr. 60:21-25, 141:17-142:4; *see also United States v. Suojanen*, No. 8:08CR5, 2009 WL 250044, at *5 (D. Neb. Feb. 3, 2009) (holding that the odor of raw marijuana coming from a truck and from the defendant's clothes "alone" gives the officer probable cause to conduct a warrantless search of the vehicle). He specifically noticed the smell while standing next to the pickup truck and speaking with Defendant, but he noticed it throughout the course of the traffic stop with Defendant.[5] Tr. 60:14-20, 139:21-25. Deputy Arcand also located a baggie of

---

[5] The Court is not persuaded by Defendant's assertions that Deputy Arcand could not smell the marijuana because it was located inside a "hyperbaric sealed cooler lunchbox," and (2) Deputy Arcand had "a stuffy runny" nose. *See* Def.'s Mem. at 5-6. Defendant had the opportunity to ask Deputy Arcand about these topics during the criminal motions hearing but did not do so. Nor did Defendant support these contentions with any evidence.

marijuana in front of the blue pickup truck, where Defendant had been standing out of Deputy Arcand's view, and to which Defendant led him.  *See* Tr. 71:2-3, 72:2-8, 73:11-13. *See Davis*, 569 F.3d at 817-18.  Deputy Arcand testified credibly that, based on his training and experience, he believed that the baggie of marijuana came from Defendant's person because it had not been there long based on the appearance of the baggie, and he did not observe anybody in the area during the traffic stop other than Defendant.  Tr. 74:4-14. Additionally, as discussed previously, Defendant's uncharacteristic behavior made Deputy Arcand suspicious that criminal activity was afoot.  Namely, because Defendant had immediately approached him at his squad car, tried to interact with him there instead of in the pickup truck, and refused to sit back in his vehicle, Deputy Arcand believed that something illegal may be in the blue pickup truck.  *See* Tr. 67:2-68:12.

Considering all of these circumstances, there was a reasonable probability that marijuana was located inside the vehicle, and Deputy Arcand thus had probable cause to search the entire vehicle for drugs.  Accordingly, pursuant to the automobile exception, no warrant was required to search the blue pickup truck.  Therefore, the Court recommends that Defendant's motion to suppress be denied.

### D. Search Warrant of the Residence

Defendant also moves to suppress any and all evidence obtained from the search of his residence.  Def.'s Suppression Motion at 1.  Defendant asserts that the search warrant affidavit failed to establish a nexus between the place to be searched and the items sought. *Id*. at 2.  Defendant also argues under the fruit of the poisonous tree doctrine that without

the illegally obtained evidence from the traffic stop,[6] the search warrant affidavit failed to establish probable cause to search the home.  *See, e.g.,* Def.'s Mem. at 8.

At the hearing, the Court confirmed that Defendant is seeking a "four-corners" review of the warrant to determine whether there was sufficient information contained therein to support a finding of probable cause.  *See* Tr. 20:17-25.   The Government responds that "the February 19 traffic stop and search of [Defendant's] vehicle were constitutional. The search warrant's reliance upon information gathered during the stop and vehicle search is therefore legally unproblematic."  Gov't's Post-Hearing Mem. in Opp. at 30.

"The Fourth Amendment requires that search warrants be supported by probable cause."  *United States v. Tripp*, 370 Fed. App'x 753, 757 (8th Cir. 2010).  "If an affidavit in support of a search warrant sets forth sufficient facts to lead a prudent person to believe that there is a fair probability that contraband or evidence of a crime will be found in a particular place, probable cause to issue the warrant has been established."  *United States v. Hudspeth*, 525 F.3d 667, 674 (8th Cir. 2008) (quotation omitted); *accord Illinois v. Gates*, 462 U.S. 213, 238 (1983) ("The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."); *see also United States v. Tellez*, 217 F.3d 547, 550

---

[6] As discussed *supra*, this Court finds that the evidence obtained from the traffic stop was not illegally obtained. Accordingly, this Court does not address Defendant's fruit of the poisonous tree argument.

(8th Cir. 2000) ("there must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue").

The sufficiency of the affidavit is evaluated using a totality-of-the-circumstances approach. *United States v. Augustine*, 663 F.3d 367, 372 (8th Cir. 2011). "When determining whether probable cause exists, a court does not independently evaluate each piece of information, but, rather, considers all of the facts for their cumulative meaning." *United States v. Willis*, No. 11-cr-13 (DSD/JJK), 2011 WL 1100127, at *1 (D. Minn. Mar. 14, 2011), *report and recommendation adopted*, 2011 WL 1060981 (D. Minn. Mar. 23, 2011). "Probable cause requires only a showing of fair probability, not hard certainties." *Hudspeth*, 525 F.3d at 676 (citing *Gates*, 426 U.S. at 213).

> When the issuing judge relied solely upon the supporting affidavit to issue the warrant, only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause. The affidavit should be examined under a common sense approach and not in a hypertechnical fashion. When the affidavit is based on information from an informant, the informant's reliability, veracity, and basis of knowledge is relevant to whether the affidavit provided probable cause to support the search.

*United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005) (quotations and citations omitted). "Because reasonable minds may differ on whether a particular search-warrant affidavit establishes probable cause, the issuing court's determination is accorded great deference." *Willis*, 2011 WL 1100127, at *2.

Turning to the search warrant affidavit for Defendant's residence, Detective Daniel Neitzel explained what happened during Deputy Arcand's traffic stop on February 19 with Defendant. *See* Ex. G-3. Specifically, the affidavit explained that Deputy Arcand observed

33

Defendant leave one of the driveways of the residence in a truck. *Id.* Deputy Arcand was familiar with Defendant and knew that his driver's license was suspended. *Id.* Detective Neitzel then described the events that followed, including that Deputy Arcand recovered a stolen handgun, a Glock magazine, marijuana, one pound of methamphetamine, and five Ziploc baggies containing a large amount of white crystal substance inside the truck. *Id.* The affidavit stated that Deputy Arcand knows that Defendant stays at the residence and that he has a bedroom in the northeast corner of the lower level. *Id.* Detective Neitzel also noted that officers observed surveillance cameras installed on the exterior of the residence. *Id.* The affidavit stated that officers ran Defendant's criminal history and found that he has been convicted of multiple violent felonies and thus is ineligible to possess a firearm. *Id.* Lastly, based on the information provided in the affidavit, Detective Neitzel stated that he has reason to believe Defendant's residence is being used as an outlet for illegal drug activity and requested permission to search and seize evidence of possession and/or sale of illegal drugs. *Id.* The warrant application and affidavit were provided to the state district court judge the same day, and the search warrant application was granted. *Id.*

Given the information provided in the search warrant affidavit, this Court finds that it would be reasonable to infer that Defendant's residence would contain illegal drugs. The facts alleged in the affidavit indicate that Defendant was distributing drugs. A large amount of methamphetamine was recovered from Defendant's vehicle, along with a firearm. With respect to a nexus, not only did the traffic stop occur just outside of Defendant's residence, but Deputy Arcand was also familiar with the fact that Defendant resided in a bedroom in the northeast corner of the lower level of the residence. Based on the foregoing, Detective

34

Neitzel's affidavit contained sufficient information from which the state district court judge could conclude that there was a fair probability that contraband or evidence of a crime would be found at Defendant's residence. Thus, the Court concludes that the warrant was supported by probable cause.

Assuming *arguendo* that the affidavit failed to establish probable cause for the warrant, "the good-faith exception to the exclusionary rule, established in *United States v. Leon*, 468 U.S. 897 (1984), would have to be considered." *Willis*, 2011 WL 1100127, at *3. "Under *Leon*, the exclusionary rule is not to be applied to exclude the use of evidence obtained by officers acting in reasonable reliance on a detached and neutral [judge's] determination of probable cause in the issuance of a search warrant that is ultimately found to be invalid." *United States v. Keele*, 589 F.3d 940, 944 (8th Cir. 2009) (quotation omitted). "Evidence should be suppressed only if the affiant-officer could not have harbored an objectively reasonable belief in the existence of probable cause." *United States v. Gibson*, 928 F.2d 250, 254 (8th Cir. 1991). "If a warrant is 'based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable,' an officer's reliance on the warrant cannot have been in good faith." *United States v. Goody*, 377 F.3d 834, 836 (8th Cir. 2004) (quoting *Leon*, 468 U.S. at 923 (internal quotation marks omitted)). The court's inquiry is confined "to the objectively ascertainable question of whether a reasonably well trained officer would have known that the search was illegal despite the issuing judge's authorization." *Hudspeth*, 525 F.3d at 676 (quotation omitted).

35

Here, Deputy Arcand and the officers who executed the warrant "acted in objectively reasonable reliance" on the warrant issued by the state district court judge. *See Gibson*, 928 F.2d at 253 (citing *Leon*, 468 U.S. at 922); *accord Goody*, 377 F.3d at 836 ("[W]e see nothing to indicate that the officers did not act with objective good faith on the [issuing judge's] probable-cause determination."). There is nothing to indicate that the state district court judge was anything other than neutral and detached when evaluating the warrant application. *See Keele*, 589 F.3d at 944. There is also nothing to indicate that Detective Neitzel was dishonest or reckless in preparing the affidavit. *See Gibson*, 928 F.2d at 254 ("Suppression is an appropriate remedy if the judge, in issuing the warrant, was misled by information in the affidavit that the affiant knew or would have known it was false except for the affiant's reckless disregard for the truth."). Finally, the affidavit was not so facially lacking in probable cause as to preclude reasonable reliance on them. *See Hudspeth*, 525 F.3d at 676; *Gibson*, 928 F.2d at 254. In sum, the Court finds that probable cause existed to support the warrant in question and, even if probable cause did not exist, the *Leon* good-faith exception would apply. Therefore, the Court recommends that Defendant's motion to suppress be denied.

### E.  Jurisdiction

Defendant moves to dismiss the Indictment, arguing that the Court lacks jurisdiction in this case because he "is sovereign and a[n] American national heir to the Moroccan Empire by jus sanguimis." Def.'s Jurisdiction Motion at ¶ 1; *see also* ECF Nos. 89-1, 90, 93. He claims that his name is "Sheik El Robbin Allen Thomas El Bey," and that he has been "kidnapped" and is being "held hostage." Def.'s Jurisdiction Motion at ¶ 2; *see also*

ECF No. 90.  He claims that officers and judicial officers are "obligated to notify 'foreign nationals' of such rights per the Consular Notification and access manual 5th Edition 2018."  Def.'s Jurisdiction Motion at ¶ 2.  He claims that he "was not notified of his treaty rights nor his right to consular notification during the time of examination nor when he was detained."  *Id*.  He argues that the Moroccan Empire or Consulate is "the primary [j]urisdiction for [this] case."  *Id*. at ¶ 3.  Defendant claims that:

> The Moroccan Empire has a well established court at the Minnesota state republic, and has competent jurisdiction and proper venue to hear and decide this case under consular jurisdiction at the Minnesota state republic authority of Article 20 and 21 of the Treaty of Peace and Friendship of 1836 between United States of North America and the Moroccan Empire, and Article III, section 2 and Article VI, section 2 of the Organic Constitution for the UNITED STATES OF AMERICA INC.

*Id*. at ¶ 4.  Defendant contends that the "Moroccan Consulate has invoked and activated their right to Consular Jurisdiction over national Sheik El Robbin Allen Thomas El Bey." *Id*. at ¶ 8.  As such, Defendant claims that the Court must (1) "withdraw the plea of not guilty" in this case, and (2) "immediately dismiss [this] case, so that the Consular Court can prosecute the defendant."  *Id*.

Defendant submitted numerous memoranda, exhibits, and affidavits in support of his argument that this Court lacks jurisdiction.  *See, e.g.,* ECF Nos. 89, 89-1, 90, 103; *see also* Exs. D-1, D-2, D-6.  Exhibit D-1 is an "Affidavit in Fact" signed by "Shiekess Wazira Bey El," who claims to be a "minister, consul, attorney in fact" for "the Moorish Science Temple of America at Palouse."  Ex. D-1 at 2.  She asks that this case be dismissed with prejudice "[i]n light of the First Step Act for the nonviolent, this World Crisis/Pandemic, [the Court's] Constitutional Oath and [its] Fiduciary obligations to human man, the

37

Moorish Science Temple of America, [and] Prophet Noble Drew Ali and its heirs." *Id.*

Exhibit D-2 appears to be a 29 second video of United States Government officials

speaking. *See* Ex. D-2. For example, Barack Obama says, "The first nation to recognize

my country was Morocco." *Id*. at 00:00-00:03. Hillary Clinton says, "No country has been

a friend of the United States longer than Morocco. You were the first nation to recognize

us back in 1777." *Id*. at 00:04-16. Bill Clinton says, "Ten years later our two countries

approved a treaty of peace and friendship, which today remains the longest unbroken treaty

of its kind in all history." *Id*. at 00:18-00:29. Exhibit D-6, along with the other memoranda

filed by Defendant, includes several Moorish-related documents, certificates, and

proclamations.

The Government contends, and this Court agrees, that Defendant's argument that

this Court lacks jurisdiction over him because he is an American Moorish National is

frivolous and without merit. In addressing a similar jurisdictional challenge on the basis

of a defendant's claim to be a Moorish American, the Fourth Circuit Court of Appeals

stated succinctly:

> We find no merit in [the defendant's] jurisdictional argument. Neither the
> citizenship nor the heritage of a defendant constitutes a key ingredient to a
> district court's jurisdiction in criminal prosecutions: 'The district courts of
> the United States shall have original jurisdiction, exclusive of the courts of
> the states, of all offenses against the laws of the United States.' 18 U.S.C. §
> 3231 (2006); *see also Hugi v. United States*, 164 F.3d 378, 380 (7th Cir.
> 1999) ('Subject-matter jurisdiction in every federal criminal prosecution
> comes from 18 U.S.C. § 3231, and there can be no doubt that Article III
> permits Congress to assign federal criminal prosecutions to federal courts.
> That's the beginning and the end of the 'jurisdictional' inquiry.').

*United States v. White*, 480 Fed.Appx. 193, 194 (4th Cir. 2012).

As this Court found previously, Defendant does not have immunity from United States law because the Moorish Nation has not been recognized as a sovereign state by the United States. *See* Court's December 2, 2021 Order ("Order") at 4, ECF No. 73 (citing *Speed v. Mehan*, No. 4:13-CV-1841-SN-LJ, 2013 WL 5776301, at *1 (E.D. Mo. Oct. 25, 2013) (collecting cases)). Courts across the country have repeatedly held that Moors are not sovereign citizens and have no immunity from United States law:

> Many [Moors] argue, without any basis in fact, that as a result of eighteenth-century treaties the United States has no jurisdiction over its Moorish inhabitants . . . [Defendant] may be a Moor but—we emphasize, in the hope of staving off future such frivolous litigation—he is not a sovereign citizen. He is a U.S. citizen and therefore unlike foreign diplomats has no immunity from U.S. law.

*Bey v. State*, 857 F.3d 559, 561 (7th Cir. 2017); *see also, e.g., United States v. Burton*, 856 Fed.Appx. 173, 175 (10th Cir. 2021) (rejecting the defendant's argument that his Moor nationality removed him from the criminal jurisdiction of the district court); *United States v. Burris*, 231 Fed.Appx. 281, 282 (4th Cir. 2007) (finding the defendant's claim that the court lacked jurisdiction because of his status as a Moorish American National "patently frivolous"); *Shepherd v. Payne*, No. 4:20-CV-844-KGB-BD, 2020 WL 8513838, at *1 (E.D. Ark. July 22, 2020) (explaining that "the United States does not recognize the Moorish Nation as a sovereign state," and the petitioner's "proclaimed status as a Moorish American National does not entitle him to violate the law without consequence"); *Boyle v. Missouri*, No. 4:13-CV-1792-HEA, 2013 WL 5651394, at *1 (E.D. Mo. Oct. 15, 2013) (same). Thus, Defendant's purported status as an American Moorish National "does not place him beyond the reach of federal or state law." *See Johnson-Bey v. Kelley*, No. 5:19-

CV-00150-DPM-JJV, 2019 WL 3887966, at *3 (E.D. Ark. July 23, 2019) (citing *United States v. Toader*, 409 F.App'x 9, 13 (7th Cir. 2010) (rejecting the argument "that the federal courts lack subject matter jurisdiction over [the defendant] and that the laws he is charged with violating are inapplicable to him because his is a . . . Moorish National Citizen")), *report and recommendation adopted*, 2019 WL 3883995 (E.D. Ark. Aug. 16, 2019).

Accordingly, this Court rejects Defendant's argument that the district court lacks jurisdiction over his case because of his Moor nationality. As such, this Court recommends that Defendant's motion to dismiss for lack of jurisdiction be denied.

### F. Indictment

Lastly, Defendant moves to dismiss his case due to a "defective indictment and fatal flaw on [the] indictment." *See* Def.'s Indictment Motion at 1. Defendant argues that ATF Special Agent William Wethington provided testimony to the grand jury that "conflict[s] with the records and the video tape recording," and that he "omit[ted] vital evidence to the record." *See id.*[7] Defendant contends that [t]hese actions show that there was purposeful false and misleading information given to the Grand Jury in order to obtain an indictment," and that the case must therefore be dismissed with prejudice. *See id.* at 5, 8.

Grand jury proceedings "are afforded a strong presumption of regularity, and a defendant faces a heavy burden to overcome that presumption when seeking dismissal of

---

[7] Defendant also argues that Deputy Arcand lied under oath at the March 18 motions hearing and "contradict[ed] the record due to inherently incredible or conclusive statements rather th[a]n facts." *See* Def.'s Indictment Motion at 102. These arguments appear to relate to Deputy Arcand's credibility in connection with Defendant's Suppression Motion, ECF No. 47. However, as discussed *supra* in Sections III.A. through III.C., this Court finds Deputy Arcand's testimony to be credible. The Court has reviewed thoroughly the body worn cameras, squad car cameras, and other exhibits provided, and concludes that Deputy Arcand's testimony was consistent with what occurred on February 19.

an indictment." *United States v. Exson*, 328 F.3d 456, 459 (8th Cir. 2003) (citing *United States v. Hintzman*, 806 F.2d 840, 843 (8th Cir. 1986)); *see also United States v. McKie*, 831 F.2d 819, 821 (8th Cir. 1987) ("the defendant has a heavy burden in proving irregularities" in grand jury proceedings).  Dismissal of an indictment "is appropriate only if the defendant shows actual prejudice." *Exson*, 328 F.3d at 459 (citing *United States v. Kouba*, 822 F.2d 768, 774 (8th Cir. 1987)); *see also United States v. Ziesman*, 409 F.3d 941, 948 (8th Cir. 2005) (holding dismissal of a grand jury indictment proper only "upon a showing of actual prejudice to the accused"); *accord McKie*, 831 F.2d at 821 ("the extreme remedy of dismissal of an indictment is appropriate only if there is a showing of actual prejudice").  Further, the possibility that a witness may have given false testimony before the grand jury does not automatically vitiate an indictment based on that testimony. *See United States v.* Cady, 567 F.2d 771, 776 (8th Cir. 1977); *United States v. Levine*, 700 F.2d 1176, 1179 (8th Cir. 1983).  Nor will mistakes or misstatements by a grand jury witness.  *See Levine*, 700 F.2d at 1180; *see also United States v. Moore*, 184 F.3d 790, 794 (8th Cir. 1999).  Instead, even if a witness provided false or perjured testimony in some way, "[a]s long as there is some competent evidence to sustain the charge issued by the Grand Jury, an indictment should not be dismissed." *Levine*, 700 F.2d at 1180.

Here, Defendant points to several instances where Special Agent Wethington's testimony allegedly conflicted with the evidence.  For instance, Defendant contends that Deputy Arcand testified at the motions hearing that he had never seen Defendant in the blue pickup truck or known him to ever be in the vehicle. Def.'s Indictment Motion at 3. Defendant argues that Special Agent Wethington's grand jury testimony was "a direct

[c]ontradiction" of Deputy Arcand because Special Agent Wethington testified that the vehicle is "known to him as [Defendant's] vehicle" and "he knew [Defendant] by this vehicle [and] to own this vehicle." *See id*.   However, that is not what Special Agent Wethington said in his testimony.  Instead, as Defendant quotes the grand jury testimony, Special Agent Wethington testified that, "Deputy Arcand observed [Defendant,] *a subject known to him*, operating a vehicle in the vicinity. And knowing him[,] he knows that he had a suspended license."  *See id.* at 2 (emphasis added).  Special Agent Wethington did not tell the grand jury that Deputy Arcand knew Defendant to be associated with the blue pickup truck, just that Deputy Arcand knew Defendant.

As additional examples, Defendant contends that the grand jury testimony about where Deputy Arcand allegedly identified Defendant and where Deputy Arcand conducted the traffic stop is inconsistent with the evidence.   At the March 18 hearing, Deputy Arcand testified that he was able to identify the driver as Defendant as he was turning from 149th Avenue into the west driveway of his residence.  Tr. 39:20-21, 88:1-2, 100:8-9, 101:6-103:23; *see also* Ex. G-1 at 00:28.  He also testified that he activated his emergency lights "right before or as [Defendant] was pulling into the west driveway leading to the house." Tr: 39:22-40:7; *see also* Tr. 49:2.   The Court has reviewed the sealed grand jury transcript, *see* ECF No. 114, and concludes that Special Agent Wethington's grand jury testimony is not inconsistent with Deputy Arcand's testimony at the March 18 hearing or the body worn camera or squad car video.

There is no evidence to support Defendant's claims that "purposeful false and misleading information [was] given to the Grand Jury in order to obtain an indictment."

*See* Def.'s Indictment Motion at 5.  Instead, this Court finds that Special Agent Wethington's grand jury testimony was accurate and consistent with the evidence presented at the motions hearing.  Additionally, even if Special Agent Wethington's testimony did contain some mistakes, "misstatements or mistakes alone [do not] justify the dismissal of an indictment which is valid on its face."  *See Levine*, 700 F.2d at 1180.  And even assuming that Defendant could have shown that Special Agent Wethington committed perjury or otherwise provided false information to the grand jury, which this Court finds he did not do, dismissal of the indictment would not result because "there is some competent evidence to sustain the charge issued by the Grand Jury."  *See id.; see also United States v. Johnson*, 767 F.2d 1259, 1275 (8th Cir. 1985) (holding that even if agent perjured himself before the grand jury, dismissal is not proper where defendants had not shown that the grand jury heard no evidence competent to sustain the indictment).

Having failed to show that Special Agent Wethington's testimony was false or perjured in any way, the Court finds that Defendant has not met his "heavy burden" of establishing that he was prejudiced by any errors in the grand jury proceeding.  *See Kouba*, 822 F.2d at 774; *see also Exson*, 328 F.3d at 459.  Therefore, this Court recommends that Defendant's motion to dismiss the indictment on the grounds that false and misleading testimony was presented to the grand jury be denied.

[*continued on next page*]

## IV. RECOMMENDATION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY RECOMMENDED** that:

1. Defendant's Motion to Suppress Evidence Obtained by Search and Seizure, ECF No. 47, be **DENIED**.

2. Defendant's Pro Se Motion to Dismiss Due to Lack of Jurisdiction, ECF No. 89, be **DENIED**.

3. Defendant's Pro Se Motion to Dismiss with Prejudice Defective Indictment, ECF No. 104, be **DENIED**.

Date: June___6___, 2022                          _____*s/Tony N. Leung*_____
                                                 Tony N. Leung
                                                 United States Magistrate Judge
                                                 District of Minnesota

                                                 *United States v. Thomas*
                                                 Case No. 21-cr-93 (JRT/TNL)

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.